[This opinion has been published in *Ohio Official Reports* at 90 Ohio St.3d 108.]

THE STATE OF OHIO, APPELLEE, *v.* HESSLER, APPELLANT.

[Cite as *State v. Hessler*, 2000-Ohio-30.]

*Criminal law—Multiple aggravated murders—Death penalties upheld, when.*

(Nos. 96-2819 and 97-52—Submitted February 9, 2000—Decided September 27, 2000.)

APPEALS from the Court of Common Pleas of Franklin County, No. 95CR-11-6906, and the Court of Appeals for Franklin County, No. 96APA12-1664.

————————

{¶ 1} Defendant-appellant, Jerry F. Hessler, appears before this court as a result of his actions on November 19, 1995. On that date, appellant fatally shot four people (Brian, Tracey, and Amanda Stevens, and Paul Thane Griffin), and attempted to murder three or four others (Mark Campolito, Ruth Canter, and Judy and/or Douglas Stanton). The facts leading up to these tragic events are as follows.

The Relationships

{¶ 2} Appellant met Judy Stanton in the mid-1970s through their association with the Mormon Church. The two dated off and on for several years. At some point, the relationship became serious, and the couple discussed marriage. In 1980, the appellant left for National Guard training. Upon his return, he discovered that Judy had been dating his friend, Doug Stanton. In fact, Judy and Doug's relationship had progressed to the point where they had decided to marry. When appellant heard this news, he was devastated. He described Doug as "Judas" and made several threats of physical harm to him. In one such threat, appellant told Doug, "I'm going to make you a nonentity, you will cease to exist, you will not know where, you will not know when, and you will not know how, but it will happen." Doug and Judy married in January 1981 and eventually moved away from Columbus. They asked appellant on numerous occasions to leave them alone.

However, appellant always managed to track them down and consistently sent cards and packages to Judy. The Stantons' last move was from Michigan to Ashland, Ohio. They left no forwarding address. In addition, they told their families and friends not to give out their address. Finally, the cards and packages stopped.

{¶ 3} After his breakup with Judy, appellant was hospitalized several times for mental illness. From April through June 1981, appellant spent several weeks in day treatment at Riverside Methodist Hospital for severe depression. In August 1982, appellant spent ten days at Riverside for severe depression and was diagnosed with borderline personality disorder. In September 1982, appellant was hospitalized at Ohio State University Medical Center for major affective disorder, major depression, and dependent personality. In February 1983, following four weeks at the Central Ohio Psychiatric Hospital ("COPH"), appellant was diagnosed as having mixed personality disorder with hysterical, dependent, and passive-aggressive features. Appellant received outpatient care from other mental health professionals during this time as well.

{¶ 4} Appellant also met Laura Griffin through the Mormon church. Their relationship began in the mid-1980s. Appellant viewed Laura as his "best buddy." Laura began dating David Stacey, another Mormon church member and appellant's good friend. At some point, appellant and Stacey had a serious falling out, and appellant became very aggressive toward Stacey. Appellant began harassing Stacey and Griffin. They asked appellant to leave them alone. The two married in 1988 and moved from Columbus. Because appellant frightened them, Griffin asked her parents not to disclose their location. Despite their desire, appellant managed to locate them and learned their Hawaii address.

{¶ 5} In 1991, appellant was hired as a customer service representative for Bank One in Columbus. Through work, he met Tracey Myers, who began working for Bank One in 1993. Tracey quickly became the object of his affections. Appellant told his mother that he thought he had finally found a replacement for

2

Judy. At first, Tracey was receptive to appellant's advances. Yet eventually she asked him to leave her alone. Tracey turned her attentions to Brian Stevens, another Bank One employee. Tracey and Brian married in 1995. Appellant continued to shower Tracey with small gifts and unwanted attention. Tracey complained to Bank One management. Fellow bank employee Amy Wells, married to Doug Wells, made similar complaints about appellant.

{¶ 6} Management met with appellant. In August 1994, appellant signed a document stating that he would not have contact with Tracey. He agreed that if he did, it would constitute grounds for his termination. When appellant violated the terms of the document, his supervisor, Mark Campolito, supported by bank managers (Kim Ogilbee and Mary Freeh), fired appellant in October 1994.

{¶ 7} As he had been after his breakup with Judy Stanton, appellant was devastated by his termination. After he was fired, appellant started damaging his mother's house and became verbally abusive to her. His mother was so frightened by appellant's behavior that she moved out of her house and moved in with her mother for a time. When appellant's youngest brother came to the house to retrieve some camping gear, appellant chased him with a gun. These events prompted appellant's family to contact the police, a lawyer, the Columbus prosecutor's office, and community health personnel in the spring of 1995 in an effort to get help for appellant.

{¶ 8} In May 1995, appellant was involuntarily committed to COPH. COPH records show that appellant was diagnosed as having delusional disorder, persecutory type, a possible intermittent explosive disorder, and dependent personality. When he was discharged from the facility on July 20, 1995, appellant's prognosis was only fair. After August 1995, appellant failed to keep followup psychiatric appointments and may have stopped taking his medication.

{¶ 9} After his discharge from COPH, appellant returned to his job at Ameritech, and his family bought a car for him. However, some time in the fall,

appellant cried to his mother, "I'm back to doing the same things that I did before I went to the hospital."

{¶ 10} In fall 1995, appellant's mother discovered appellant combing through a garbage bag in her garage. Appellant told her to stay away. Yet when appellant left, his mother went through the bag and found items discarded by Tracey, such as her bank statements and diapers. Appellant's mother became worried and she told her daughter-in-law of her findings. On November 14, her daughter-in-law telephoned Bank One officials to warn them about appellant.

{¶ 11} On November 12, Karen McNelis, a casual friend, saw appellant at their health spa. He told her he was going to settle the score with the people responsible for his firing at Bank One. He appeared determined and said that he had been thinking about it for over a year.

{¶ 12} Also, some time in October or November, another friend, Laura Agaristi, had contact with appellant. He asked her to go target-shooting with him. He told her that he had a new gun. During one of their conversations, appellant told her that he was going to bake a cake for Tracey and if she did not accept, it was "not going to be very pretty." Earlier that summer, appellant had asked Agaristi to be his alibi. He said, "You will know when I need it. * * * Just say that I spent the night with you."

The Events of November 19

{¶ 13} In the afternoon hours of November 19, appellant stopped over at his mother's house. Before he left, he hugged her and told her, "Mom, everything will be all right."

{¶ 14} Around 5:00 p.m., Roger and Sherry Bartz, neighbors of Brian and Tracey Stevens, saw a suspicious man walking and then running near the Stevens house on Tulane Road in Columbus, Ohio. Eventually, this man, whom they later identified as appellant, drove away in a dark blue Chevrolet Nova with a loud

muffler. A few minutes before 7:00 p.m., Karen McCoy noticed a "real angry" man, later identified as appellant, sitting in a parked car near the Stevenses' home.

{¶ 15} Shortly after 7:00 p.m., Ruth Canter, Brian and Tracey's friend, looked out the Stevenses' front window and saw a red plastic gas can on the front porch. When Brian learned of this, he went outside to investigate. Once outside, Brian saw appellant. He warned appellant to go away or he would call the police. Brian hurried back inside the house and closed and locked the door. Canter heard banging on the door. She then heard popping sounds and felt her leg getting hot. She ran upstairs and hid in Brian and Tracey's closet. After she heard the screen door shut and the noise from a loud car, she walked downstairs and found Brian, Tracey, and their infant daughter, Amanda, lying on the floor. Brian's seven-year-old son, Reid, was wandering around the downstairs area.

{¶ 16} At 7:12 p.m., the first police officer arrived at the Stevenses' home and found a nearly hysterical Canter, who informed him that people had been shot. Inside the house, police discovered Brian, Tracey, and Amanda, still alive. Canter had been shot in the leg. She told the police that appellant was responsible. At the scene, police recovered eight 9-mm shell casings, as well as five 9-mm bullets or fragments. Later, coroners also recovered 9-mm bullets from the bodies of Brian, Tracey, and Amanda. Police noticed that the front door had been knocked off its frame and that a gasoline container was sitting in the living room.

{¶ 17} Brian died as a result of a bullet that perforated his intestines and abdominal aorta. Tracey, shot five to six times, died as a result of two gunshot wounds. One bullet perforated her skull and brain. Another injured internal abdominal organs. Tracey had been holding Amanda, and Amanda was shot twice, possibly by bullets that passed through her mother. The bullet causing Amanda's death perforated her colon and small intestine, and injured the spleen, kidney, and lung.

**{¶ 18}** Appellant left the Stevenses' home and traveled a few blocks to another residence. Sometime between 7:20 and 7:30 p.m., he knocked on the door. When Kera Mechim answered the knock, a man who "seemed very friendly," later identified as appellant, asked to speak with Mark Campolito. Mechim explained that Campolito no longer lived there but that his phone number was the same. Appellant responded that he did not want to call Campolito, as he was a friend from out of town and he wanted to surprise him. Appellant asked Mechim two times whether she was related to Campolito.

**{¶ 19}** Somehow appellant discovered Campolito's address, and around 7:30 p.m., appellant knocked on his Indianola Avenue apartment door. Campolito looked outside and saw appellant pacing back and forth. When Campolito opened the door, a nervous appellant told Campolito that he was fine, that he had another job, and that he felt bad because the two had parted on bad terms. Feeling sorry for appellant, Campolito invited appellant in to talk. When Campolito went into his bedroom to quickly put something on his feet, appellant followed him and fired several shots, one of which hit Campolito in the arm. While lying on the floor, Campolito retrieved a rifle, and managed to call 911.

**{¶ 20}** Police and medics arrived. Campolito told the police that appellant had shot him, which prompted a statewide alert for appellant. Medics then transported Campolito to the hospital, where he was hospitalized for eight days. Despite two operations, at trial Campolito had only limited use of his arm. The police recovered three 9-mm shell casings and bullet fragments from the apartment.

**{¶ 21}** Just after 8:00 p.m., Susan and Paul Thane Griffin, who lived in Worthington, were talking on the telephone with their daughter, Laura. The doorbell rang, and Thane went to answer it. Susan heard three loud noises and went to the foyer. Susan found the front door open and Thane lying in the entryway with a severe head wound and a bullet wound to the chest.

{¶ 22} Mary Terminello, a neighbor, heard several popping sounds that evening and saw a man in his thirties walk from the Griffins' home and get into a dark blue or black Chevrolet and drive away. William Gahagan, another neighbor, also heard three gunshots and saw a dark-colored car drive away. The car's muffler made a noticeable rumbling noise. Gahagan went to the Griffins' house and saw Thane, bleeding, lying in the entryway.

{¶ 23} The police and medics arrived around 8:15 p.m. The medics transported Griffin to the hospital although he had no pulse. Griffin died as a result of multiple gunshot wounds. One bullet grazed his liver, and passed through his intestines, pancreas, and a back muscle, and another bullet fractured his skull, causing extensive damage to the brain. The coroner recovered two 9-mm bullets from his body. Police found three spent 9-mm shell casings and a bullet fragment at the scene.

{¶ 24} Sergeant Denise Reffitt was working that night monitoring the police radio. She heard about the multiple homicides and the suspect. She knew appellant from church. She contacted appellant's older brother and sister-in-law to determine other potential victims. The sister-in-law mentioned Judy Stanton and Laura Griffin.

{¶ 25} Around 10:00 p.m., Judy Stanton received phone calls from her brother and Reffitt, urging her to flee her house in Ashland because appellant was on a shooting rampage. Judy's husband, Doug, grabbed two guns, and then he and Judy herded their four children into the kitchen. Doug turned off the lights and went outside to see if it was safe to leave.

{¶ 26} After Doug saw appellant approach the house, he retreated, locked the door, and told Judy and the children to lie down on the kitchen floor. Over the years, Doug had performed "bad man" drills with the children because of their fear of appellant. So the children knew what to do and did as Doug instructed. Appellant knocked on the kitchen door and, in a disguised voice, said he needed

help. Doug told him to go away. Appellant asked for help three times. Finally, Doug told appellant that he was armed. Appellant fired three shots through the back door, kicked the door open, and fired four more shots into the kitchen. Doug, armed with a Walther .380 and a Colt .45 caliber pistol, saw a silhouette in the doorway. Doug crouched and returned fire with seven rounds from his Colt .45. Appellant left.

{¶ 27} When police arrived, they found several 9-mm bullets or fragments. They also found bullet holes throughout the kitchen, including three in the back door. Police recovered seven 9-mm shell casings on the back steps, porch, and yard. Police also found Doug's empty Colt .45 lying on the kitchen floor. None of the Stantons was shot.

{¶ 28} By 10:30 p.m., Ashland police officers, in response to a statewide police bulletin, had stopped appellant's blue Chevrolet Nova. Appellant immediately obeyed police directions to get out, and was "calm, polite and courteous." He told police that his weapon was still in the car. Although he had been shot and was bleeding slightly, the bulletproof vest he was wearing had prevented serious injury. He had $625 and two loaded 9-mm magazines in his pockets. Appellant told the police, "The guy is good, * * * he got me from a cross position, center mass, just like they teach you." Appellant said, "I was aiming high and I did not expect him to crouch." At the hospital, appellant also told a nurse that he had been taught that "you can do anything you want to do as long as you accept the consequences."

{¶ 29} On the front seat of the car, police found a loaded Smith & Wesson semiautomatic 9-mm pistol. Appellant had bought this weapon from a Westerville gun shop on October 27, 1995.

{¶ 30} Ballistics tests confirmed that this weapon had fired bullets and shells recovered from the crime scenes and from the victims. Almost all of the

bullets were hollow-point ammunition. This type of ammunition causes the most tissue damage.

{¶ 31} In searching the vehicle, the police found appellant's passport, pages from an address book, binoculars, a knife, a sledge hammer, ear plugs, and eleven books of matches. Inside the trunk, police found four red plastic gasoline containers, three of which held gasoline. Under the seats, police found additional boxes of 9-mm ammunition. Altogether, appellant had around two hundred eighty lead bullets, fifty-five full metal jacket bullets, and forty hollow-point bullets.

{¶ 32} On the front passenger floorboard, police found a piece of paper listing, in appellant's handwriting, the names and addresses of Kim Ogilbee, Thane Griffin, Mark Campolito, Mary Freeh, Tracey Stevens, and Doug and Amy Wells. With the exception of Griffin, every person on the list was associated with Bank One.

{¶ 33} In August and September 1996, appellant was tried and convicted. In November 1996, appellant was sentenced to death for the aggravated murders. Appellant also received sentences for the attempted aggravated murders and other charges.[1] Appellant appealed both to this court and to the court of appeals. The court of appeals dismissed the appeal for lack of jurisdiction.

{¶ 34} This cause is now before the court upon an appeal as of right from the common pleas court and a motion to dismiss the appeal from the court of appeals.

---

1. Appellant was charged in a twelve-count indictment. He was convicted of six counts of aggravated murder with death penalty specifications, one count of the lesser included charge of murder (Amanda Stevens), three counts of attempted aggravated murder, one count of burglary, and one count of improperly discharging a firearm, all with gun specifications. Counts I and IV were merged with Count IV surviving, Counts II and V were merged with Count V surviving, and Counts III and VI were merged with Count III surviving, leaving appellant with a total of four death sentences. For the remaining offenses, appellant was also sentenced in accordance with law.

*Ron O'Brien*, Franklin County Prosecuting Attorney, and *Joyce Anderson*, Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker*, Ohio Public Defender, *J. Joseph Bodine, Jr.* and *Kelly Culshaw*, Assistant Public Defenders, for appellant.

_____

**FRANCIS E. SWEENEY, SR., J.**

{¶ 35} The appeal from the court of appeals is dismissed. *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.

{¶ 36} Appellant presents nine propositions of law for our consideration. See Appendix. We have carefully considered each proposition, independently weighed the aggravating circumstances against the evidence presented in mitigation, and reviewed the death penalties for appropriateness and proportionality. For the following reasons, we affirm the convictions and uphold the death penalties.

Reasonable-Doubt Instruction

{¶ 37} In his first proposition of law, appellant finds fault with the reasonable-doubt instruction. This court has repeatedly rejected appellant's general complaint about the statutory definition of "reasonable doubt." See *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604. Moreover, since appellant failed to object to the instructions as given, he has waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶ 38} Admittedly, as to Count XI, which dealt with the attempted aggravated murder of the Stantons, the court did erroneously instruct, "If you find that the state proved beyond a reasonable doubt *any of the elements* of attempted aggravated murder * * * your verdict must be guilty of that offense." Although that statement was wrong, no plain error occurred. The instructions as a whole clearly conveyed the state's burden to prove every element of the offenses charged to permit a guilty finding. Additionally, the evidence of appellant's guilt as to all the

offenses, which trial counsel all but admitted in closing argument, was compelling. No other result could have occurred with a different instruction. Proposition I is rejected.

Jury Misconduct in Sentencing Phase

{¶ 39} In Proposition II, appellant argues that juror misconduct "infected the jury's deliberations and polluted its recommendation." Appellant asserts that the trial court erred by not holding a hearing in the presence of all interested parties to determine whether the jury panel was unfair and biased. Appellant also believes that the court was required to explain the consequences of a jury deadlock. Finally, he contends that the court erroneously denied his post-trial motion for a new trial and an evidentiary hearing based on the alleged misconduct. For the following reasons, we reject these contentions.

{¶ 40} As a reviewing court, we show deference to the trial judge, who sees and hears the events and thus is in a better position to accurately evaluate the situation and determine the appropriate scope of inquiry. *State v. Huertas* (1990), 51 Ohio St.3d 22, 29, 553 N.E.2d 1058, 1067; *United States v. Ramos* (C.A.5, 1995), 71 F.3d 1150, 1153-1154. Therefore, we employ an abuse-of-discretion standard and will not reverse the trial court unless it has handled the alleged juror misconduct or ruled upon the post-trial motion in an "unreasonable, arbitrary, or unconscionable" manner. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149. We now consider the relevant facts.

{¶ 41} The jury began penalty deliberations on Friday morning, October 4. That night, at 10:15 p.m., the jury reported that it had reached a verdict.[2] The judge assembled the attorneys and appellant, and asked if there was anything further before he brought the jury back into the courtroom. It was at this point that the

---

2. The trial court and counsel in their briefs repeatedly refer to "the verdict" or "verdicts" despite the fact that the decisions rendered by a jury after the mitigation phase are properly termed "sentencing recommendations." Semantics aside, we understand what they mean.

bailiff asked to approach the bench, and informed the judge of a problem. Thereupon, the judge accompanied the bailiff into the hallway and discovered a distraught juror. She was crying and saying, "I cannot go back into this courtroom" and "I will not go into that room anymore with those people, I cannot go any further. I just cannot do any more." The judge did not address her. Instead, he returned to the courtroom and explained the situation to the attorneys. The attorneys agreed with the judge's suggestion that he question the juror to find out the problem. The judge returned to the hallway with the court reporter.

{¶ 42} The judge asked her if the jury had reached a decision. She said yes. The judge then asked her whether she would be able to return to the courtroom. She replied, "I don't think so, no. I can't." The judge then inquired whether she had signed the verdict forms. After she said that she had, the judge told her she must return to the courtroom. In reply, the juror stated, "Then I guess I have to, but I'm going crazy, I do not agree with any of the people in there. They're all like— and you know, I cannot handle that pressure. You know, I cannot be around that, okay. Let's just do it. Okay, I'm upset, I don't want to do it. I cannot do it." After hearing these remarks, the judge told her he needed to speak with the attorneys.

{¶ 43} Following consultation with counsel, the judge went back and again talked privately with the juror. This colloquy appears on the record:

"The court: [Juror], this is a very important matter and I want you to be relaxed. I want you—

"[The juror]: I am not relaxed.

"The court: Now, you are with the judge and the court reporter—would you like to have a cup of water?

"[The juror]: No, no.

"The court: I want you to relax now. I want to tell you that as a judge, it is my responsibility to make sure that this trial runs in an appropriate way. Do you understand that?

"[The juror]: Yes.

"The court: I know you do. Now, [juror], it was indicated to me over an hour ago, in fact, that this jury had reached a verdict—

"[The juror]: I'll go back in there. I'll go back in.

"The court: Now, [juror], what has to be done is, you must go into the courtroom and take your seat, and then, of course, the court will obtain the verdict forms, okay?

"[The juror]: Yes, okay.

"The court: And then—and then it will be the responsibility of [the bailiff], who you have seen and have known for more than a few days—and then I have to ask each juror at the appropriate time, at the appropriate time, I have to ask is this in fact—and then I say the name of each individual juror, and then I ask is this your verdict? And then you respond in the appropriate way. Do you understand that, [juror]? You have to respond accordingly. Do you understand that?

"[The juror]: What if I don't agree, then what?

"The court: Well, I cannot say—

"[The juror]: All right, all right, I will go in there, it's just that, you know, I just—you know, the people are so rude and so mean I cannot stand it.

"The court: I'll tell you this, [juror]. You are bound by an oath to tell the truth, you are bound by an oath to tell the truth. And the court—the court and the parties expect you to abide by your oath. Do you understand that?

"[The juror]: Yes.

"The court: Now, the bailiff will ask the question 'Is this your verdict?' and nobody else can answer that, nobody else can answer that. You must answer that. You have to answer it truthfully and you cannot, you cannot lie about anything. Do you understand?

"[The juror]: Yes, okay. Okay.

"The court: [Juror], you have taken an oath to tell the truth. Do you understand?

"[The juror]: Everyone is yelling at you, okay. All right, fine. Okay, I'm all right. I'm all right—

"The court: Wait, wait. I want to make sure you understand that you must be honest, you must tell the truth, you cannot let somebody else make a decision for you. Do you understand that? Do you understand that, [juror]?

"[The juror]: Yes.

"The court: Would you like a cup of water?

"[The juror]: No.

"The court: I want to give you every opportunity to be relaxed and get your thoughts together so that you are at ease and so that you are comfortable and so you will answer according to what is true to you, to what is true to you, as to what's the truth for you, what is the truth for you. I am only interested in what the truth is for you. Do you understand that, [juror]?

"[The juror]: Yes, yes.

"The court: Do you need more time?

"[The juror]: I'm okay, I'm okay.

"The court: If you need more time—

"[The juror]: No, no, I'm okay.

"The court: We're going to go back into the courtroom now, but I want to make sure you understand and that's the reason I'm taking this time for you. I want to make sure you understand.

"[The juror]: Thank you.

"The court: You are more than welcome, [juror]. I understand the significance of any decision that this jury has to make, and I want to make sure that you understand that when you go into that courtroom, that you only answer for yourself, answer only for yourself and no one else. Not for this judge or anyone

14

else, no one else is going to put words in your mouth or pressure you. This is your decision and only your decision, and I cannot emphasize any more than the importance of you to be truthful and honest with your own convictions. Now, do you understand that, [juror]?

"[The juror]: Yes.

"The court: There is no pressure on you, no one, no one is going to pressure you into making any kind of decision other than the decision that you yourself are going to make. Do you understand that, [juror]?

"[The juror]: I'll be here forever.

"The court: [Juror], time is not consequential. What is important, [juror]—

"[The juror]: It is to me.

"The court: —what is important is that you make the decision and you alone can only make the decision that you will be asked in that courtroom. Do you understand that?

"[The juror]: Yes. But I have to go home, I need to go home for my kids. Okay, I guess I'm as ready as I'll ever be.

"The court: Are there any questions that you want to ask me about?

"[The juror]: Yes. I just – okay, if I don't agree, then what?

"The court: That's for me to worry about, not you. You make the decision as to—

"[The juror]: Everyone will think I'm crazy, okay. I—okay, I understand.

"The court: Do you understand, [juror]?

"[The juror]: Yes.

"The court: Do you understand when we go into the courtroom what will happen?

"[The juror]: Yes.

"The court: When we go into the courtroom, I will ask the foreperson, whoever it is, if in fact the jury has reached a verdict. And if in fact, that foreperson

says yes, we have reached a verdict, then I will ask the question, 'Does anybody disagree with the verdict or verdicts that have been signed?' Do you understand, [juror], I will ask that question? Do you understand?

"[The juror]: Yes. Are you going through everybody?

"The court: Then after the verdicts are given to me, I will review the verdicts and then the bailiff will read the verdicts forms. Do you understand, [juror]?

"[The juror]: Then you ask if everybody agrees with them first?

"The court: Yes. If anyone disagrees with the verdict or verdicts that have been reached, [the bailiff], at the appropriate time, will go through and ask each juror by name, is this your verdict? Is this your verdict? That is the procedure. Do you understand that?

"[The juror]: Yes.

"The court: Are you clear on that?

"[The juror]: Yes. If I would disagree before that, what would we do?

"The court: I have to make that decision, I am the judge.

"[The juror]: Okay, I'm fine, I'm fine.

"The court: But you have to make that decision, you and only you can make that decision. Do you understand that?

"[The juror]: Yes.

"The court: Okay. Are you sure you're okay?

"[The juror]: Yes.

"The court: All right. I have to go and talk to counsel now. [The bailiff] will stay with you now."

{¶ 44} Following a discussion with counsel, the jury was brought back into the courtroom and its decision was announced. When individually polled, the juror stated that she agreed with the recommendations.

**{¶ 45}** Appellant contends that this dialogue shows that the juror wanted to vote for life sentences but was unfairly coerced and pressured to vote for death. Thus, appellant believes he was denied the right to a fair and impartial jury because of juror misconduct. He asks that his death sentences be vacated, that the matter be remanded to the trial court for the imposition of life sentences, and that the matter be remanded for an evidentiary hearing. However, in light of this record, we cannot say that juror misconduct occurred.

**{¶ 46}** "The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen v. United States* (1896), 164 U.S. 492, 501, 17 S.Ct. 154, 157, 41 L.Ed. 528, 531. The requirement of a unanimous decision, however, does not come without a price. Heightened emotions and intense feelings are part and parcel of this process. Experience tells us that during deliberations, it is not unusual to find heavy-handed influencing, browbeating, and even bullying to a certain extent. For always there is the possibility that "articulate jurors may intimidate the inarticulate, the aggressive may unduly influence the docile." *People v. De Lucia* (1967), 20 N.Y.2d 275, 278, 282 N.Y.S.2d 526, 529, 229 N.E.2d 211, 213; *People v. Redd* (1990), 164 A.D.2d 34, 37, 561 N.Y.S.2d 439, 440 (both cases providing policy reasons for rule prohibiting jurors to impeach their own verdicts).

**{¶ 47}** Here, the judge's entire questioning of the juror appears on the record. When the court initially confronted the juror, she was upset and unnerved by the deliberations, thought the other jurors were "mean" and "rude," and wanted to go home. The court took great pains to calm her down and carefully reminded her of the importance of the proceeding and her part in it. Moreover, he repeatedly told her she must be true to her voir dire oath and vote her conscience, and asked if she understood his instructions. Several times, the court told her there was "no pressure" on her and to "answer only for yourself," and stated, "No one else is going to put words in your mouth or pressure you." The juror stated that she understood

that she would be individually questioned and answered that she knew that she must be true to her convictions. At the end of the dialogue, the juror said, "I'm fine, I'm fine."

**{¶ 48}** Furthermore, if there was any chance that she did not agree with the death sentences announced in court, she had the chance to say so during the individual jury polling. A jury poll's purpose is to "give each juror an opportunity, before the verdict is recorded, to declare in open court his assent to the verdict which the foreman has returned and thus to enable the court and the parties to ascertain with certainty that a unanimous verdict has in fact been reached and that no juror has been coerced or induced to agree to a verdict to which he has not fully assented." *Miranda v. United States* (C.A.1, 1958), 255 F.2d 9, 17. Crim.R. 31(D). Here, the juror was given the chance to declare in open court her assent to or dissent from the recommendations. Thus, she was given the opportunity to change her mind if she desired. However, each time she was individually polled about a recommendation, she answered that she agreed with it, and she registered no further complaints. Under these circumstances, we conclude that the juror exercised her free will and that she agreed with the sentencing recommendations announced in court. Thus, we do not find that juror misconduct "infected the jury's deliberations and polluted its recommendation" as alleged by appellant.

**{¶ 49}** Moreover, we do not find the trial court abused its discretion in proceeding as it did. First, we note that appellant agreed to the procedure employed, thus waiving all but plain error. *State v. Hill* (1995), 73 Ohio St.3d 433, 444, 653 N.E.2d 271, 281.

**{¶ 50}** Second, the fact that the questioning occurred in appellant's absence is not plain error. An accused's presence "is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *Snyder v. Massachusetts* (1934), 291 U.S. 97, 107-108, 54 S.Ct. 330, 333, 78 L.Ed. 674, 679, overruled on other grounds, *Duncan v. Louisiana* (1968), 391

18

U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (accused not prejudiced by absence from jury view although prosecutor directed jury to view particular items).

{¶ 51} We also reject appellant's contention that the court was required to hold an evidentiary hearing into the matter according to *Remmer v. United States* (1954), 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654.

{¶ 52} In *Remmer*, the Supreme Court held that when improper contacts with a jury are discovered by the parties after the verdict, the trial court must conduct a hearing to determine the effect of those contacts. However, more recent cases have determined that the complaining party must show actual prejudice. See *Smith v. Phillips* (1982), 455 U.S. 209, 215, 102 S.Ct. 940, 945, 71 L.Ed.2d 78, 85; *United States v. Olano* (1993), 507 U.S. 725, 738, 113 S.Ct. 1770, 1780, 123 L.Ed.2d 508, 522; *United States v. Sylvester* (C.A.5, 1998), 143 F.3d 923, 934.

{¶ 53} In this case, the court did not abuse its discretion in interviewing this juror as it did in order to make sure that she understood that the choice was hers and hers alone. No further *Remmer* hearing was required. The parties knew about the communications between the court and the juror before they occurred, and did not suddenly discover them after the trial. Moreover, appellant never asked to question the juror before the sentence recommendations were announced, nor immediately thereafter. The lack of prejudice to appellant is manifest. The discussion at issue was recorded, and occurred after the jury had already reached a decision and the juror had already signed the sentencing forms. Moreover, in questioning the juror, the court used appropriate caution in investigating the claim of misconduct. The judge was careful not to discuss the evidence or substantive issues and never injected himself into jury deliberations. Since those deliberations had concluded, nothing said or done by the trial judge could have affected the deliberations. See *State v. Allen* (1995), 73 Ohio St.3d 626, 630, 653 N.E.2d 675, 682; *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 149, 524 N.E.2d 881, 886-887

(cases finding prejudice "involved the possibility that the jury's verdict might have been influenced by the judge's response").

{¶ 54} Nor was the court obligated to instruct this juror as to the consequences of a breakdown in the deliberative process. See *Jones v. United States* (1999), 527 U.S. 373, 379-383, 119 S.Ct. 2090, 2098-2099, 144 L.Ed.2d 370, 381-383. We find that the trial court adequately answered the juror's concerns in this regard. The judge correctly told the juror that it was not her concern and that it was up to him to make a decision if she changed her mind. This explanation is reasonable because a court has several different options when faced with a hung jury. For instance, the court could give the *Howard*[3] charge and send the jury back for further deliberations. Another option is that the court could instruct the jury to consider life sentences. Or, another possibility, the court could discharge the jury and impose life sentences. Thus, the court was not faced with just one solution and was correct in explaining to the juror that it was its responsibility to decide how to handle the situation.

{¶ 55} Finally, we consider whether the trial court abused its discretion in refusing to grant a new trial or to conduct a later evidentiary inquiry.

{¶ 56} Two weeks after the jury was discharged but before sentences were imposed, appellant moved for a new trial and an evidentiary hearing on the basis of the alleged juror misconduct. In support of this motion, appellant presented two affidavits: one from the distraught juror and the other, submitted after denial of the motion, from an alternate juror.

{¶ 57} In her affidavit, the juror asserted that she voted for the death penalty only after being demeaned and chastised by other jurors for voting for life. She claimed that she signed solely to avoid further harassment and that she did not understand the ramifications of signing. She also averred that she was confused by

---

3. See *State v. Howard* (1989), 42 Ohio St.3d 18, 537 N.E.2d 188, paragraph two of the syllabus.

the judge's instructions and was afraid of being punished for not going along with the other jurors. Although she disagreed with the death penalty, she was afraid to say so in public. The alternate juror, who observed the deliberations, asserted that there was coercion on the holdouts from jurors favoring the death penalty. She also averred that the jury disregarded mitigating evidence and did not properly weigh aggravating circumstances against mitigating factors.

{¶ 58} The trial court did not err in refusing to consider this evidence. A firmly established common-law rule flatly prohibits the admission of juror testimony to impeach a jury verdict. *State v. Robb* (2000), 88 Ohio St.3d 59, 79, 723 N.E.2d 1019, 1043. Reflecting that principle, Evid.R. 606(B), the *aliunde* rule, governs the competency of a juror to testify at a subsequent proceeding concerning the original verdict. It states:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court."

{¶ 59} The purpose of the *aliunde* rule is to maintain the sanctity of the jury room and the deliberations therein. *State v. Rudge* (1993), 89 Ohio App.3d 429, 438-439, 624 N.E.2d 1069, 1075-1076. The rule is designed to ensure the finality of jury verdicts and to protect jurors from being harassed by defeated parties. The rule requires a foundation from nonjuror sources. Thus, we have held that "the

information [alleging misconduct] must be from a source which possesses firsthand knowledge of the improper conduct. One juror's affidavit alleging misconduct of another juror may not be considered without evidence *aliunde* being introduced first." *State v. Schiebel* (1990), 55 Ohio St.3d 71, 75, 564 N.E.2d 54, 61.

**{¶ 60}** First, we do not consider the alternate juror's affidavit as outside evidence. *State v. Reiner* (2000), 89 Ohio St.3d 342, 731 N.E.2d 662. Despite the Crim.R. 24(F) prohibition, the alternate juror was permitted to be present during deliberations. Since counsel did not object and alleges no error based on her presence, we consider her as part of the jury. Therefore, her affidavit is not outside evidence of alleged misconduct.

**{¶ 61}** Second, we find that these affidavits do not offer evidence of any improper extraneous influence (*i.e.,* threats, bribes, or attempted threats or bribes or improprieties by a court officer); hence, the exceptions to Evid.R. 606(B) do not apply. Instead, we determine that the affidavits offer internal evidence of the jury's deliberations in order to impeach the sentencing recommendations. This is precisely what Evid.R. 606(B) prohibits. Thus, the trial court did not abuse its discretion in overruling the motion for a new trial or an evidentiary hearing.

**{¶ 62}** In conclusion, we find that the trial court did not abuse its discretion in its handling of the alleged improper misconduct or in its ruling on the later motion for a new trial or an evidentiary hearing. Proposition of Law II is rejected.

Admissibility of Evidence in the Penalty Phase

**{¶ 63}** In the fourth proposition of law, appellant contends that words he wrote on the walls of a holding cell after the guilty verdicts were rendered were erroneously admitted into evidence during the sentencing phase of his trial. These words were "mercilessly plan, relentlessly prepare, violently execute, ruthlessly finish." In sentencing instructions, the court advised the jury to consider this evidence only with respect to the multiple-murder specifications as rebuttal

evidence to the mitigating factor as to the lack of the substantial capacity to conform his conduct to the requirements of the law.

{¶ 64} The trial court did not abuse its discretion by admitting these writings as rebuttal evidence. Seldom do a defendant's own words so cogently portray his motives, plans, and state of mind. The evidence thus counters appellant's claims that he lacked substantial capacity to conform his conduct to the requirements of the law. R.C. 2929.04(B)(3). It suggests that he focused his thoughts on careful planning, preparation, and ruthless execution, and such thinking tends to contradict clinical psychologist Dr. Jeffrey Smalldon's testimony about appellant's impaired ability to conform his behavior to law. The state was entitled to introduce relevant evidence rebutting the existence of any mitigating factor first asserted by the defense. *State v. Raglin* (1998), 83 Ohio St.3d 253, 261, 699 N.E.2d 482, 490.

Competency to Stand Trial

{¶ 65} In Proposition V, appellant contends that the trial court, *sua sponte,* should have ordered a competency examination and conducted a competency hearing. We reject this contention.

{¶ 66} Due process principles require that a criminal defendant who is legally incompetent may not be tried. *State v. Berry* (1995), 72 Ohio St.3d 354, 359, 650 N.E.2d 433, 438. R.C. 2945.37 requires a competency hearing if a request is made before trial. If the issue is raised after trial has begun, the court will hold a hearing only if good cause is shown. Therefore, the decision whether to hold a competency hearing once trial has begun is in the court's discretion. *State v. Rahman* (1986), 23 Ohio St.3d 146, 156, 23 OBR 315, 323, 492 N.E.2d 401, 410. The right to a hearing rises to the level of a constitutional guarantee where the record contains sufficient "indicia of incompetence" to necessitate inquiry to ensure the defendant's right to a fair trial. *Berry, supra,* 72 Ohio St.3d at 359, 650 N.E.2d at 439.

23

**{¶ 67}** Here, the record does not reflect indicia of incompetence requiring a competency hearing. First, although appellant was hospitalized several times for mental illness, mental illness is not necessarily legal incompetency. *Berry*, syllabus. Moreover, "[a] defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *State v. Bock* (1986), 28 Ohio St.3d 108, 110, 28 OBR 207, 210, 502 N.E.2d 1016, 1019.

**{¶ 68}** Second, counsel did not suggest that appellant lacked competence. If counsel had some reason to question his competence, they would have done so.

**{¶ 69}** Third, Dr. Smalldon's testimony offered no reason to question appellant's competence. Smalldon testified that he always began evaluations by asking, "Is there any reason to question whether this individual is competent to stand trial?" Yet Smalldon never volunteered any reservations about appellant's competence to stand trial. Appellant was articulate, had superior intelligence with no brain impairment, reported no hallucinations, was oriented as to time and place, and knew why he was in jail. (In fact, his remark at the hospital after he was arrested is particularly telling. He stated that he had been taught that "you can do anything you want to do as long as you accept the consequences.") We find that appellant fully cooperated with Smalldon, discussed the offenses and his preparations for committing them, and was capable of making logical and rational decisions. The trial court did not abuse its discretion.

Prosecutorial Misconduct in Closing Argument

**{¶ 70}** In Proposition VI, appellant argues that the prosecutor's sentencing argument was "saturated with emotion and served to inflame the jury." As stated in *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885, the test regarding prosecutorial misconduct in closing arguments is "whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant."

**{¶ 71}** We have applied this test when considering the claimed improper comments. We find that when the sentencing argument is viewed in its entirety, the prosecutor was fair, did not improperly appeal to the jury's emotion, and did not create prejudicial error. We reject this proposition of law.

Irregular Penalty Recommendations

**{¶ 72}** In Proposition VII, appellant argues that based on the jury's penalty recommendations, double jeopardy precludes the death penalty.

**{¶ 73}** During the penalty hearing, appellant requested individual penalty recommendations for each aggravating circumstance. The trial court granted the request and instructed the jury to return separate recommendations as to each aggravating circumstance in each count. The jury recommended the death penalty for the R.C. 2929.04(A)(5) multiple-murder specifications in Counts I through V and Count X, and life sentences for the felony-murder specifications in Counts I through V.

**{¶ 74}** The trial court erroneously instructed the jury to consider each aggravating circumstance separately. Aggravating circumstances in a single count are considered collectively in assessing the penalty for that count, and a defendant is sentenced only on individual criminal counts, not on specifications of aggravating circumstances. *State v. Reynolds* (1998), 80 Ohio St.3d 670, 685, 687 N.E.2d 1358, 1373; *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus. However, appellant cannot complain, since he asked for these sentencing forms, which were more favorable to him than correct forms and instructions would have been. "A party will not be permitted to take advantage of an error which he himself invited or induced." *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.* (1986), 28 Ohio St.3d 20, 28 OBR 83, 502 N.E.2d 590, paragraph one of the syllabus; *State v. Seiber* (1990), 56 Ohio St.3d 4, 17, 564 N.E.2d 408, 422.

**{¶ 75}** Additionally, we find that appellant's contention that double jeopardy prevents the death penalty lacks merit. Appellant relies on *Bullington v. Missouri* (1981), 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270, which held that double jeopardy principles precluded the death penalty during a retrial after the jury recommended and the defendant was sentenced to life imprisonment at his first trial.

**{¶ 76}** In this case, however, no retrial is involved, and the court is not asked to approve changing an original life sentence to a death sentence. Thus, other precedents are more relevant. For instance, in *Schiro v. Farley* (1994), 510 U.S. 222, 230, 114 S.Ct. 783, 789, 127 L.Ed.2d 47, 57, the Supreme Court declined to "treat the sentencing phase of a single prosecution as a successive prosecution for purposes of the Double Jeopardy Clause." *Schiro* also held that collateral estoppel would apply only if the record established that an issue was actually and necessarily decided in a defendant's favor.

**{¶ 77}** The individual sentences in Counts I through V as to the multiple-murder and felony-murder specifications are consistent. The weight to be given an aggravating circumstance in the R.C. 2929.04 weighing process obviously depends upon the specific aggravating circumstance involved. The jury could reasonably find that appellant's course of conduct in carrying out multiple murders was far more grave and serious, and thus merited the death penalty, while the felony-murder death specifications did not deserve capital punishment. Cf. *State v. Hicks* (1989), 43 Ohio St.3d 72, 78, 538 N.E.2d 1030, 1037-1038 (two aggravating circumstances need not be weighed equally).

**{¶ 78}** In this case, the jury recommended death in six different counts, *i.e.,* those relating to the multiple-murder specifications in Counts I through V and in Count X (the aggravated murder of Griffin, which did not include a felony-murder specification). No jeopardy attached and no inconsistency exists as to the recommendations. Proposition VII is rejected.

Trial Court Sentencing Opinion

**{¶ 79}** In Proposition VIII, appellant argues that the trial court in its sentencing opinion improperly considered nonstatutory aggravating circumstances and victim-impact evidence, and failed to give appropriate weight to evidence of mental impairment. However, any such errors can be readily cured by our independent review of appellant's death sentences. See *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293, 304; *State v. Johnson* (2000), 88 Ohio St.3d 95, 121, 723 N.E.2d 1054, 1076. This proposition is without merit.

Constitutional Issues

**{¶ 80}** Appellant's Proposition IX presents challenges to the constitutionality of Ohio's death-penalty statutes. These challenges are summarily rejected. See, *e.g., State v. Raglin*, 83 Ohio St.3d at 261, 699 N.E.2d at 490; *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264. Appellant's constitutional challenge to the system of direct Supreme Court review from the trial court is also rejected. *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668, syllabus.

Independent Sentence Evaluation

**{¶ 81}** Having considered appellant's propositions of law, we now review appellant's death sentences for appropriateness (also raised in appellant's third proposition of law) and proportionality.

**{¶ 82}** In mitigation, appellant presented the testimony of several witnesses. Carlene Hessler, appellant's mother, testified that appellant was the oldest of three sons. Her husband and appellant's father, Earl, was an alcoholic for many years. Earl would verbally, and sometimes physically, abuse the entire family. However, his worst abuse of his sons was directed toward appellant. Earl did not have a close relationship with his sons and never attended any school functions.

**{¶ 83}** Appellant was an average student in school and was an avid reader. He graduated from high school, was active in the Mormon church, and went on his

church mission to Louisville, Kentucky, for two years. After he returned from his mission, he lived at home. Appellant did not drink or smoke, and his frequent exercise kept him in good shape. Appellant was in the National Guard, which he loved, until his arrest in 1995.

{¶ 84} Following his breakup with Judy Stanton, appellant was hospitalized several times in 1981, 1982, and 1983 because of his mental condition. After he was released, he lived with his maternal grandmother for a period of time.

{¶ 85} After his hospitalizations, appellant worked steadily for JC Penney, Metropolitan Insurance, and Bank One. When his father died in 1986, appellant moved back home. However, this was not a good arrangement, because appellant took over the house. In addition, appellant had horrible nightmares and cried a lot.

{¶ 86} Appellant was devastated after he was fired from Bank One. He became increasingly unstable. His mother was so scared of him that she moved out of her house. After she left, appellant severely damaged the house. Appellant broke mirrors, punched holes in many walls, emptied drawers, removed a whole wall and back door, and scattered dirty dishes and garbage everywhere.

{¶ 87} Appellant's mother also testified regarding the family's efforts to get help for him in 1995. Various records document the family's attempts to secure help from the authorities.

{¶ 88} Appellant's youngest brother, Russell Hessler, confirmed that Earl was an alcoholic and abusive father. Although Earl would verbally and physically abuse them, Earl seemed angrier with appellant. While growing up, Russell and appellant had a "stormy relationship." After Russell left the Marine Corps, both he and appellant lived at home, but appellant would stay up all night and make noises, making it difficult for others to sleep. Appellant was inconsiderate of his family members and would not take responsibility for his actions. When appellant returned home in 1986 after his father's death, he took over the house and objected when Russell stopped by to visit.

{¶ 89} In the spring of 1995, appellant became more violent. He destroyed the house and left it ankle deep in trash and debris. Once, when Russell stopped over to get camping gear, appellant appeared "very excited, agitated, wild looking" and chased him with a metal pipe and gun.

{¶ 90} Dr. Randy Otto, a clinical psychologist, reviewed appellant's mental health records and found that his behavior before the offenses was "alarming and disturbing" and presented a high risk of violence to others. In his view, the 1995 COPH records lacked a plan to decrease this risk. Otto believes that appellant's July 1995 discharge from COPH was "ill conceived and poorly planned."

{¶ 91} Dr. Jeffrey Smalldon, a clinical psychologist, reviewed case records and conducted comprehensive interviews and tests. Appellant was always "unfailingly polite and cooperative," but at times was "very depressed," and at other times his mood was elevated. Appellant was bright, with an IQ of 121, but was an underachiever in school. Appellant was "very serious, very earnest, intense and rigid" and his life's dominant theme concerned "his history of relationships." Appellant's relationship with his mother was ambivalent; at times it was "highly confrontational" and he spoke contemptuously of her although he had a "strong dependency on her." He hated his father. In his twenties, his strongest relationship was with Judy Stanton, and later, Laura Griffin. His recurring pattern in relationships was to idolize a woman and give her a lot of attention, which ultimately would be viewed as "excessive and suffocating and intrusive."

{¶ 92} Because of his father's abuse, appellant suffered from chronic feelings of inadequacy, low self-esteem, and uselessness, and grew up as a lonely, isolated individual with few friends and limited social skills. His relationship with the Mormon church ended in 1986 or 1987 because of his "unchristian conduct," and that also devastated him. He joined the National Guard in 1980, which served as one area of success in his life. He also remained steadily employed in the customer-service field.

{¶ 93} According to Smalldon, all the clinicians who evaluated appellant at COPH agreed that appellant was very seriously mentally ill and dangerous. Yet appellant lacked insight into his mental illness and had a long history of noncompliance with outpatient treatment. Appellant's profile indicated chronic maladjustment and extreme emotional immaturity with strong feelings of persecution. Smalldon believed that appellant suffers from borderline personality disorder, passive-aggressive disorder, caffeine-related disorder, narcissistic and obsessive compulsive traits, and possibly bipolar disorder.

{¶ 94} In Smalldon's opinion, appellant's "severe and longstanding mental illness" substantially impaired his ability to conform his behavior to the requirements of the law and constituted a mitigating factor under R.C. 2929.04(B)(3). Smalldon testified that appellant never expressed remorse, or exhibited guilt or shame for what he had done, was oriented as to time and place, reported no hallucinations, and was capable of making logical and rational decisions. He stated that appellant does very well in a highly structured environment like prison.

{¶ 95} After independent assessment, we find that the evidence proves beyond a reasonable doubt the aggravating circumstance charged against appellant in Counts III, IV, V, and X. As to each count, appellant engaged in a "course of conduct involving the purposeful killing of or attempt to kill two or more persons." R.C. 2929.04(A)(5). We find that the evidence establishing appellant's intent to kill several persons is compelling and was proven beyond reasonable doubt.

{¶ 96} Considering mitigation, nothing in the nature and circumstances of the offenses is mitigating. The evidence shows that appellant methodically planned to kill several victims that Sunday evening in several different locations. Although not the target of his aggressions, innocent children were endangered. In fact, Amanda Stevens was murdered simply because she happened to be in her mother's arms. Appellant's purchase of a weapon three weeks before and his conversations

with family and friends indicate that he had thought about his revenge for a long time before he acted. Moreover, by using hollow-point ammunition, he clearly intended to inflict maximum injuries on his victims.

{¶ 97} Nothing in appellant's character and his relationships with other people suggests mitigation. However, appellant's history and background do have mitigating features. As a youth, appellant suffered mental and physical abuse from his alcoholic father. His mother's dependent personality did little to shield him from this abuse. In fact, she suffered right along with appellant and his brothers. Appellant's abusive father and dependent mother undoubtedly contributed to his mental difficulties. His family background provides some mitigation. See *State v. Berry*, 72 Ohio St.3d at 365, 650 N.E.2d at 442-443; *State v. Awkal* (1996), 76 Ohio St.3d 324, 338, 667 N.E.2d 960, 972.

{¶ 98} Appellant did work steadily throughout his life and thereby contributed to society, a fact deserving weight in mitigation. *State v. Mitts* (1998), 81 Ohio St.3d 223, 236, 690 N.E.2d 522, 533; *State v. Awkal*, 76 Ohio St.3d at 338, 667 N.E.2d at 972. Appellant also served honorably in the Ohio National Guard for over fifteen years, earning promotion to the rank of sergeant first class.

{¶ 99} R.C. 2929.04(B)(3) sets forth the following mitigation factor: "Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law." Dr. Smalldon believed that appellant met the criteria for this mitigating factor. We give weight to that opinion.

{¶ 100} Unquestionably, appellant has serious mental problems that contributed to his conduct that Sunday evening. His mental problems necessitated extensive hospitalization in 1981 through 1983, when he was suffering from adjustment reaction and severe depression. In the late spring and summer of 1995, he was involuntarily committed to COPH for psychiatric care and diagnosed with

a "delusional disorder, persecutory type," and possible "intermittent explosive disorder." Seen by many mental health professionals, appellant was repeatedly diagnosed with disorders including mixed personality disorder, borderline personality, and dependent personality. Also, Dr. Smalldon believed that appellant suffered from a bipolar disorder and a caffeine disorder (caused by abuse of caffeine pills), and may have suffered from a delusionary disorder of a persecutory type. However, Dr. Smalldon did find that appellant was oriented as to time and place, reported no hallucinations, and was capable of making logical and rational decisions. In fact, Dr. Smalldon believed that appellant could choose to kill. On balance, we find that the (B)(3) factor was proven.

{¶ 101} The mitigating factors found in R.C. 2929.04(B)(1), (2), (4), (5), and (6) were not proven.

{¶ 102} Based on the evidence, the aggravating circumstance in Count III (the felony murder of Amanda Stevens) outweighs the mitigating evidence beyond a reasonable doubt. Appellant's course of conduct in multiple killings is a grave circumstance. Appellant's mitigating evidence pales in significance when compared with the aggravating circumstance in Count III.

{¶ 103} The multiple-murder aggravating circumstance in Count IV (murder of Brian Stevens with prior calculation and design) also outweighs appellant's mitigation. Appellant deliberately planned and executed Brian simply because he married a woman appellant liked. The aggravating circumstance in Count V (murder of Tracey Stevens with prior calculation and design) also outweighs appellant's mitigation. Appellant planned Tracey's murder and stalked her for over a year after she told him she wanted nothing to do with him. Then he killed her in a course of conduct that also ended the lives of her husband and infant daughter. Appellant's mitigation is insignificant in light of the multiple-murder aggravating circumstance.

{¶ 104} As to Count X (murder of Griffin with prior calculation and design), the multiple-murder specification also outweighs appellant's mitigation. Again, appellant's mitigation counts for little when considered against his course of conduct in executing multiple victims.

{¶ 105} The death penalty imposed for each aggravated murder is appropriate and proportionate when compared with the death penalty for other murders that were part of a course of conduct involving multiple murders or attempted murders. See, *e.g., State v. Cornwell* (1999), 86 Ohio St.3d 560, 715 N.E.2d 1144; *State v. Clemons* (1998), 82 Ohio St.3d 438, 696 N.E.2d 1009; *State v. Mitts*, 81 Ohio St.3d 223, 690 N.E.2d 522; *State v. Keith* (1997), 79 Ohio St.3d 514, 684 N.E.2d 47.

{¶ 106} Accordingly, we affirm the judgment of the trial court.

*Appeal dismissed*
*in case No. 97-52 and*
*judgment affirmed*
*in case No. 96-2819.*

RESNICK, COOK and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., and PFEIFER, J., dissent.

DOUGLAS, J., concurs in part and dissents in part.

———————————

**MOYER, C.J., dissenting.**

{¶ 107} I concur with the decision of the majority affirming appellant's conviction for aggravated murder. However, for the following reasons, I would reverse the death sentence imposed by the trial court.

{¶ 108} The majority concludes that the distraught juror exercised her own free will and that she agreed with the sentencing recommendations announced by the jury. However, while the juror in question did state that she agreed with the recommendations of the jury when individually polled by the court, the mental

anguish she exhibited to the trial judge before the announcement of the jury recommendations required further inquiry into possible jury misconduct during the sentencing deliberations.

{¶ 109} When speaking with the distraught juror in the hallway, the trial judge informed her that, as a juror, she was required to return to the courtroom if she had signed the verdict form. The juror responded, "Then I guess I have to, but I'm going crazy, I do not agree with any of the people in there. They're all like— and you know, I cannot handle that pressure. You know, I cannot be around that, okay. Let's just do it. Okay, I'm upset, I don't want to do it. I cannot do it."

{¶ 110} Later, in the judge's chambers, the juror made several references to the conduct of the other jurors participating in the sentencing deliberations. At one point she stated, "All right, all right, I will go in there, it's just that, you know, I just—you know, the people are so rude and so mean I cannot stand it." She went further to say, "Everyone is yelling at you, okay. All right, fine. Okay, I'm all right. I'm all right."

{¶ 111} The trial judge did take measures to ensure that the juror agreed with the verdict she indicated on the verdict form. However, it is apparent from the nature of her comments that she was extremely distraught over the events that had occurred during the sentencing deliberations. Her comments also suggested that the other jurors may have threatened or coerced her during the sentencing deliberations.

{¶ 112} Evid.R. 606(B) strictly prohibits challenging a jury verdict based on jury misconduct without some outside evidence of misconduct. Here, however, the judge became aware of the possibility of juror misconduct before the announcement of the jury's sentencing recommendations. "[J]urors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict." (Emphasis *sic*.) *Tanner v. United States* (1987), 483 U.S. 107, 127, 107 S.Ct. 2739, 2751, 97 L.Ed.2d 90, 110. Therefore, I conclude that the

prohibitions embodied in Evid.R. 606(B) do not preclude inquiry into the conduct of jurors during sentencing deliberations, as long as the inquiry takes place before the announcement of the jury's recommendations.

{¶ 113} One could reasonably conclude from the distraught juror's responses to the trial judge that her signing of the jury verdict form was not her free and willing act. She told the judge that she did not agree with the other jurors; she wanted to know the consequences of her failure to agree with the other jurors; and she expressed an urgent desire to go home "for my kids."

{¶ 114} Although the trial judge earnestly and repeatedly attempted to assure the juror that her decision should be hers alone, her responses to his admonitions and assurances created at least the appearance that she probably had voted for the death penalty under some form of duress.

{¶ 115} Section 5, Article I of the Ohio Constitution guarantees the right to a trial by jury, and this right "carries with it by necessary implication the right to trial by a jury composed of unbiased and unprejudiced jurors." *Lingafelter v. Moore* (1917), 95 Ohio St. 384, 117 N.E. 16, paragraph one of the syllabus. Under the facts of this case, the principles embodied in Section 5, Article I of the Ohio Constitution required further inquiry by the trial judge into the conduct of the jurors during sentencing deliberations.

{¶ 116} It is the responsibility of the highest court of this state to carefully review the record and determine whether the proceedings in the trial court stand the test, not of perfection, but of fundamental fairness. In reviewing a record we determine fairness by applying the statutory scheme and rules for criminal procedure adopted by this court. The General Assembly has provided that "[i]f the trial jury *unanimously* finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender." (Emphasis added.) R.C. 2929.03(D)(2).

{¶ 117} The very nature of the death penalty requires that every measure be taken to ensure that the penalty is given only to those meeting the statutory requirements. The jury's recommendation regarding the sentence to be imposed for aggravated murder is an essential element in the sentencing scheme. A court may not sentence a defendant to death without a unanimous jury recommendation for the death penalty.

{¶ 118} For these reasons, I conclude that the trial judge, when confronted with such substantial evidence that a juror's signature on the verdict form was not given freely and without duress, was obligated to conduct an evidentiary hearing to determine whether misconduct had occurred. Given the serious nature of the comments and conduct of the distraught juror, I further conclude that the failure to conduct such an evidentiary hearing was prejudicial error. For this reason, I would hold that appellant's death sentence should be reversed and the case remanded to the trial court for resentencing.

PFEIFER, J., concurs in the foregoing opinion.

———————————

**DOUGLAS, J., concurring in part and dissenting in part.**

{¶ 119} I concur with the judgment of the majority affirming appellant's conviction for aggravated murder. I respectfully dissent from the judgment of the majority affirming the death sentence imposed by the trial court. As for my reasons for doing so, I join in the comments of Chief Justice Moyer.

———————————

APPENDIX

{¶ 120} Proposition of Law No. 1: When a capital jury is given reasonable doubt instructions that relieve the state of proving every element of an offense or specification, a resulting conviction is void. U.S. Const. Amend. V, VI and XIV; Ohio Const. Art. I, §§ 2, 9, 10 and 16.

{¶ 121} Proposition of Law No. 2: When evidence of juror misconduct is presented to a trial court prior to the return of the jury's recommendation and prior to sentencing, a hearing must be held to determine if the jury misconduct proves that the jury panel was unfair and biased or that the outcome of the sentencing determination was invalid.

{¶ 122} Proposition of Law No. 3: Jerry Hessler's death sentence is inappropriate. His abusive childhood and military service coupled with a mental illness that substantially impaired his ability to conform his conduct to the requirements of the law and Central Ohio Psychiatric Hospital's disregard of its irresponsibility [*sic*] to protect society from the dangerously mentally ill mitigate in favor of a life sentence.

{¶ 123} Proposition of Law No. 4: Admission of irrelevant and highly prejudicial evidence during the sentencing phase of a capital trial violates a capital defendant's right to reliable sentencing and due process as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and §§ 9 and 16, Article I of the Ohio Constitution.

{¶ 124} Proposition of Law No. 5: When a trial judge is confronted with indicia that a defendant is incompetent to stand trial, a trial court must *sua sponte* order a competency evaluation and conduct a hearing. U.S. Const. Amend. VI, VIII, and XIV; Ohio Const., Art. I, §§ 2, 9 and 10.

{¶ 125} Proposition of Law No. 6: When prosecutors make closing argument in such a manner that it inflames the jury, a capital defendant is denied his substantive and procedural due process rights to a fair trial as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 9 and 16 of the Ohio Constitution.

{¶ 126} Proposition of Law No. 7: When a capital jury returns a life sentence and a death recommendation on the same count of aggravated murder,

jeopardy attaches and the trial court must sentence the defendant to the life term. U.S. Const. Amend. V, VI, VIII, and XIV; Ohio Const., Art. I.

{¶ 127} Proposition of Law No. 8: When a trial court weighs the nature and circumstances of the offense as aggravating, considers victim impact evidence and incorrectly weighs Ohio Rev.Code § 2929.04(B)(3) mitigation, a capital defendant is deprived of his right to individualized sentencing and of his liberty interest in the statutory sentencing scheme thus violating rights guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 9 and 16, Article I, of the Ohio Constitution.

{¶ 128} Proposition of Law No. 9: Ohio's death penalty law is unconstitutional. The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Rev.Code Ann. §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05, (Anderson 1996), do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Jerry Hessler.