[Cite as *State v. Williams*, 2025-Ohio-3105.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No.  L-24-1138

       Appellant                                   Trial Court No.  CR-22-2354

v.

Ahmad Williams                                    **DECISION AND JUDGMENT**

       Appellee                                    Decided: August 29, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and,
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellant.

Fritz Byers and Samuel Kaplan, for appellee.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from the judgment by the Lucas County Court of Common

Pleas, General Division, which granted the motion for a new trial by appellee, Ahmad

Jovan Williams, after a jury convicted him of murder and of felonious assault, and after

the trial court conducted an evidentiary hearing on alleged jury misconduct. This appeal

is not a review of the merits of the jury's conviction for the foregoing offenses. For the reasons set forth below, this court reverses the trial court's judgment.

{¶ 2} Appellant, state of Ohio, sets forth the following five assignments of error:

1. During deliberations, a juror's statements based on his own education and work experience are not "extraneous prejudicial information." The trial court erred in considering juror testimony regarding such statements to be evidence of juror misconduct requiring a new trial.

2. The normal principles of waiver apply to a party's complaints that a juror injected his personal experience into deliberations, after counsel failed to make appropriate inquiries during voir dire or to challenge the juror for cause, despite the juror's admission that he might be unable to set aside his work experience and his education in assessing the evidence. The trial court erred in failing to apply these well-established principles of waiver.

3. A hearing to assess testimony about jurors' mental or emotional processes, when there has been no evidence of an outside influence or extraneous prejudicial information, violates the privacy of the jury's deliberations. The trial court erred in holding a hearing during which the jurors testified regarding their own and their fellow jurors' mental and emotional processes during deliberations.

4. The trial court erred in denying the State's motion to amend the predicate offense of felony murder by replacing felonious assault with child endangering, when both predicate offenses were charged in the indictment.

5. The trial court abused its discretion in excluding evidence of text messages that were relevant to refuting the claim of accident advanced by the defendant during his interview with law enforcement.

## I. Background

{¶ 3} On August 11, 2022, a Lucas County Grand Jury indicted appellee on one count of murder as a result of committing second-degree felonious assault, a violation of R.C. 2903.02(B), and an unspecified felony under R.C. 2929.02; and one count of felonious assault, a violation of R.C. 2903.11(A)(1), and a second-degree felony under

R.C. 2903.11(D).[1] Appellant alleged that in Toledo, Lucas County, Ohio, on or about August 1, 2022, appellee caused the death of his prematurely-born, 9-month old son, M.W., who suffered from a genetic condition that required special protocols for his care, including a feeding tube, in order to gain weight and to survive. Appellant further alleged that appellee violently shook the fragile infant in a manner called "shaken baby," which fractured his skull, damaged his spinal cord, caused his brain to shift resulting in multiple internal brain bleeds and pooled blood in his eyes, and stopped him from breathing for an extended period before finally dying at a local hospital on August 4. Appellee entered not-guilty pleas, discovery ensued, and the matter proceeded to a five-day jury trial that commenced on August 7, 2023.

## A. Voir Dire and Trial

{¶ 4} Following voir dire of the prospective jurors, the trial court seated 12 jurors and two alternates, of whom four were either current or retired nurses and one was a former emergency medical technician.[2] The jurors were assigned the numbers one through 12 and will be referred to in this decision by their assigned number.

---

[1] The indictment included one count of endangering children, a violation of R.C. 2919.22(B)(1), and a second-degree felony under R.C. 2919.22(E)(1) and (E)(2)(d). Prior to trial, the trial court denied appellant's motion to amend the indictment to substitute second-degree child endangering for the murder-predicate offense of felonious assault. The trial court then also denied appellant's motion to strike felonious assault as the murder-predicate offense. Then during trial and prior to resting its case, appellant dismissed the endangering-children count.

[2] Juror 1, the jury foreperson, was a former EMT, an experience for which appellee did not inquire during voir dire. Juror 3 disclosed being a registered nurse currently working in student health in Michigan who had formerly worked in the Toledo Hospital emergency room. Juror 6 disclosed being a retired registered nurse who had formerly worked in the Toledo Hospital emergency room. Juror 9 disclosed being a registered

3.

{¶ 5} It is undisputed that the seated jurors were deemed eligible and qualified to serve, and appellee did not object to seating any juror with a medical-related background. Juror 3, a former emergency room nurse, was openly asked by the trial court during voir dire about that professional experience, to which there was no objection by appellee:

> Court: In the ER you see a lot. Can't make you un-know what you know.
> A: Correct.
> Court: With regard to what comes into the emergency room would you be able to distinguish and separate out your daily job and still make your decision just on the information and evidence that comes in on this case?
> A: Yeah . . . I don't anticipate that being an issue, but obviously I'm not sure. Not having gone through that, but with emergency room training at Toledo Hospital, you know, we do have some training in violent crimes I guess.
> Court: Sure. And, like I said, can't make you un-know what you know.
> A: Correct.
> Court: But in terms of hows and whys and anything else with regard to facts you would listen to the evidence that came in?
> A: Uh-huh.

{¶ 6} The jury then received testimony from 13 witnesses, and the trial court admitted 24 exhibits into evidence. Appellee neither testified at trial nor presented any evidence.

{¶ 7} Prior to the start of trial, the trial court instructed the jurors that although note-taking was permitted, it "is in no way a substitute for a verbatim record of the trial or any smaller portion of the trial. . . . They are simply to be used as a tool to refresh your own

---

nurse at a different Ohio hospital. Juror 10 disclosed being a retired oncology nurse who moved from California two years ago.

memories in accordance with all instructions in mind." Many jurors chose to create their own notes, which some kept post-trial, for which the trial court further instructed:

> A transcript cannot, and will not, be provided to you at any point during the trial or after. No juror, note-taking or not, should regard any juror's notes as definitive. In fact, during deliberations the recollection of a note-taking juror as to certain evidence is to be recorded as no more accurate necessarily than the memory of a non note-taking juror. This point cannot be overemphasized.
>
> . . .
>
> I can't overemphasize enough, all information and definitions need to come from the Court, from here. Should you acquire anything about this case from an outside source, again, you must bring it to our attention.

{¶ 8} This appeal revolves around what each juror recalled about the coroner's testimony and about what Juror 3 said during deliberations about the coroner's testimony. Most jurors believed the coroner had used the phrases "shaken baby," "brain bleed," "lack of outward bruising," "labored breathing," or similar words to them, to describe the circumstances of the victim's death. They collectively recalled the coroner testified that the infant's death was not due to an accidental four-foot fall. Many jurors specifically recalled the coroner determined the manner of the victim's death was "homicide." While the jurors did not have the benefit of a transcript of the trial proceedings, those transcripts are in the record before us. A review of those transcripts supports the jurors' collective recollection of the coroner's testimony.

{¶ 9} In summary, the coroner testified that the infant's "cause of death was abusive head and neck trauma and the manner of death was homicide." The coroner explained how he arrived at the victim's cause of death being non-accidental trauma from shaking back and forth or rapid acceleration/deceleration from side to side: "And in this

5.

particular case we had an overwhelming number of the features match with what we know since the early '90s now, and has been confirmed over and over again in subsequent retrospective studies, that . . . this constellation of findings is indicative of non-accidental trauma."

{¶ 10} The coroner found subdural blood, which was "blood over the brain," skull factures, and bilateral adherent subgaleal hemorrhage, which is bleeding "over the vortex of the scalp" that was "heaviest on the right side." In infants under the age of two, such as the victim, abusive head trauma can occur from "shaking back and forth" where the infant's head rotates because it has very little muscle control. During shaking, the infant's head rotates, and that "angular rotation . . . causes the vessels that come off of the dura to snap. And that rapid acceleration/deceleration, back and forth, side to side, motion is what causes the hemorrhage into the subdural space." The coroner found "patchy acute subarachnoid hemorrhage over the cerebral convexities and brain stem" which "come from impact of the brain up against the inside of the skull. And we saw that not only just over the surfaces of the brain but over the brain stem in this particular case."

{¶ 11} The coroner testified why the victim's "optic nerve sheath hemorrhage" was not likely caused by an accidental four-foot fall, which is where the science research "is kind of settled," because that injury is typically found from a "high speed motor vehicle accident, like freeway speeds," which is not the case here. He explained, "So this is an indication that more force was applied than what would typically happen with an accidental fall at about four feet-ish or so."

6.

{¶ 12} The coroner testified what role aspiration, or vomit, and bruising on the victim played in his findings, which he described, "to be clear in this case I did not see evidence of chronic abuse, physical abuse." The coroner found "pulmonary hazy opacities," which "could be from an aspiration event or scar tissue, or a pneumonia. But at this time the lab work argues there is no pneumonia there, which supports that the aspiration was probably in and around the time the injury occurred." The coroner testified that it is not uncommon to find an inside fracture while there is a lack of outward abrasion because "it tends to involve some sort of soft or diffuse surface that spreads the supposed impact across a larger area, but the forces still translate to the bones and you get a fracture [that] would be the mechanism." The coroner further testified that it is less common to have signs of bruising in the ribs in the case of abusive head and neck trauma where the "purported mechanism is that the infant, or small child, is held by the torso with hands." And the typical "back and forth motion, as well as the impact that happens with that, and the squeezing around the torso, may create some focal bruising" but that "depends on what the kid is wearing, depends on how strongly the individual, or baby, is being held." There was "a little hemorrhage or blood in the spinal cord" at an area which "means the blood vessels were broken somehow. When you see it at this level typical mechanisms can't be direct blunt force injury to the neck, but I didn't see any fractures there. The other mechanism can be back and forth, think whiplash-type mechanism, would be a plausible mechanism."

{¶ 13} The coroner also testified on how, among the five manners of death recognized in Ohio (natural, suicide, homicide, accident, or undetermined) he arrived at
7.

homicide as the victim's manner of death: "And [the victim] being of the age it can't be suicide. It can't be natural. And given the -- the totality of all of the injuries it's non accidental thus the rendering of the manner is homicide." By way of an example, the coroner also explained the distinction between his medical determination of homicide as the manner of death and a legal determination of who is culpable for that death: "An officer shoots an assailant in self-defense because they were being charged at with a knife. I would call that a homicide. The officer shot the person charging them with the knife. All it says is that an action took place by one person resulting in another person's death, okay? That doesn't mean the officer's legally culpable."

### B. Jury Deliberations

{¶ 14} The trial concluded after both parties rested their cases. The trial court read into the record the lengthy jury instructions on the law and on the process for their deliberations and gave a copy of those instructions to each juror for use during deliberations. The jury instructions, however, are not in the record other than in the transcript of the proceedings. The following portions of the jury instructions are relevant to this appeal.

{¶ 15} The trial court first gave the jurors instructions on appellant's burden of proof beyond a reasonable doubt and how to treat the evidence at trial. To find appellant guilty, the jurors must be firmly convinced of the truth of the charge after full and impartial consideration of all the evidence that appellant proved its case beyond a reasonable doubt. The trial court reviewed direct evidence, circumstantial evidence, and whether to make an inference from the evidence "rests entirely with you." However,

8.

"You must not draw any inference or speculate on the truth of any suggestion included in a question that was not answered." The trial court explained that direct and circumstantial evidence "are of equal weight or probative value."

{¶ 16} The trial court instructed the jurors on witness credibility, the weight of the evidence, and resolving disputed facts. Among the instructions were, "You are the sole judges of the facts, the credibility of the witnesses, and the weight of the evidence. . . . You may believe or disbelieve all or any part of the testimony of any witness. It is your duty to decide what testimony to believe and what testimony not to believe. The testimony of one witness, if believed by you, is sufficient to prove any disputed fact." The jurors were cautioned about faulty memories: "Also, discrepancies in a witness's testimony, or between his or her testimony and that of others, if there are any, does not necessarily mean that you should disbelieve the witness as people commonly forget facts or recollect them erroneously after the passage of time. You are certainly all aware of the fact that two persons who are witnesses to an incident may often see or hear it differently."

{¶ 17} The trial court then gave the jurors instructions on the applicable law for appellee's offenses. Since this appeal is focused on the causation element of appellee's murder offense, the following are the relevant instructions:

> Count 1, murder. The Defendant is charged with murder. Before you can find the Defendant guilty of murder you must find beyond a reasonable doubt that on or about or between the 1st day of August, 2022 and 4th day of August, 2022, and in Lucas County, Ohio, the Defendant caused the death of [M.W.] as a proximate result of committing an offense of violence. It is a felony of the first or second degree and that is not a violation of Revised Code Section 2903.03 or 2903.04, to wit, felonious assault.

9.

. . .

Cause. The State charges that the act of the Defendant caused the death of [M.W.]. Cause is an essential element of the offense. Cause is an act that in a natural and continuous sequence directly produces the death of [M.W.] and without which it would not have occurred. There may be one or more causes of an event. However, if a Defendant's act was one cause, then the existence of other causes is not a defense.

{¶ 18} The trial court then instructed the jury on how to perform their deliberations, such as, "You are not to discuss or consider the subject of punishment. Your duty is confined to the determination of guilt or innocence of the Defendant. In the event that you find the Defendant guilty the duty to determine the punishment is placed by law upon the Court."

{¶ 19} The jurors were instructed to select a foreperson who "serves the purpose of helping to conduct your deliberations in an orderly manner and to give each of you the opportunity to express your opinion," but "does not have any greater power, nor does that person's power have anymore importance than others."

{¶ 20} The trial court instructed the jurors to openly express their views of the case and, if convinced, to change their minds. "Consider each other's views and deliberate with the objective of reaching an agreement if you can do so without disturbing your individual judgment." The trial court continued:

Each of you must decide this case for yourself, but you should do so only after a discussion of the case with the other jurors. Do not hesitate to change an opinion if convinced that it is wrong. However, you should not surrender your considered opinion concerning the weight of the evidence in order to be congenial or to reach a verdict solely because of the opinions of others. Circumstances in the case may arouse sympathy for one party or another. Sympathy is a common human emotion. You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence, to decide all the disputed questions of fact, to

10.

apply the instructions of the Court to your findings, and to render your verdict accordingly in fulfilling your duty. Your efforts must be to arrive at a just verdict. Consider all the evidence and make your findings with intelligence and impartiality, and without bias, sympathy, or prejudice so that the State and the Defendant will feel that their case was fairly and impartially tried.

{¶ 21} The trial court reminded the jurors about the limitations of a juror's note taking. "It cannot be overstressed that an individual juror's notes are just memory aids for that particular juror. . . . The fact that the note-taking juror's notes support his or her recollection of the testimony in no way makes his or her memory more reliable than that of the non note-taking juror."

{¶ 22} After deliberating for under three hours, on August 11, 2023, the jury convicted appellee of each count: murder and of felonious assault. When polled in open court, each juror affirmed their guilty verdict for both counts. The trial court then discharged the jury.

### C. Motion for New Trial

{¶ 23} Before the matter could proceed to sentencing, Juror 10 mailed a letter to the trial court judge, dated August 12, 2023, expressing remorse for their guilty verdict on count No. one, murder, for four reasons: (1) entering jury deliberations, the prosecution failed to convince Juror 10 that appellee caused the death of his infant son; (2) appellee's trial counsel confused Juror 10 when during closing arguments, he did not deny that appellee knowingly hurt the child, which confirmed his guilt for murder; (3) Juror 3 changed four juror's minds upon stating the coroner's testimony of the baby's autopsy was "definitely" due to brain trauma, based on Juror 3's emergency room

11.

experience, because that gave the probable cause connection Juror 10 believed the prosecution failed to do; and (4) Juror 10 felt, and claimed others agreed, that appellee did not deserve the "harsh verdict" of murder. Juror 10 did not express remorse for the guilty verdict for count No. two, felonious assault, which, Juror 10 understood from the jury instructions, was the predicate offense to compel the determination of count No. one, murder. The trial court promptly notified the parties regarding the letter.

{¶ 24} On August 24, 2023, appellee moved for a new trial under Crim.R. 33(A)(2)[3] and R.C. 2945.79(B),[4] based on alleged Juror 3 misconduct, attaching an affidavit by Juror 10 dated August 23. Juror 10's averments repeated the statements in the August 12 letter except for the statement that appellee's trial counsel confused Juror 10 during closing arguments by admitting the appellee hurt the fragile child. Appellee's motion, which requested an evidentiary hearing, was publicly available in the online court docket.

{¶ 25} Meanwhile, on August 30, 2023, the *Toledo Blade* newspaper published an article about appellee's conviction and his motion for a new trial, including quoting extensively from Juror 10's affidavit.

---

[3] Crim.R. 33(A)(2) states, "A new trial may be granted on motion of the defendant for any of the following causes affecting materially the defendant's substantial rights: . . . (2) Misconduct of the jury[.]"
[4] R.C. 2945.79(B) states, "A new trial, after a verdict of conviction, may be granted on the application of the defendant for any of the following causes affecting materially his substantial rights: . . . (B) Misconduct of the jury[.]"

12.

## D. Hearing on Alleged Juror 3 Misconduct

{¶ 26} Over appellant's objection, the trial court decided to hold an evidentiary hearing[5] on December 18 and 19, 2023, to determine whether Juror 3 "interjected extraneous prejudicial information" during the August 11 jury deliberations for the purposes of impeaching the verdict. All 12 jurors received subpoenas issued by the trial court to compel their appearance at the hearing and to provide testimony under oath. Defense counsel, the prosecuting attorney, and the trial court judge intensely questioned each juror about Juror 3's influence on them. Normally prohibited under Evid.R. 606(B)(1)[6], the jurors testified in detail under Evid.R. 606(B)(2)(a), whether "extraneous prejudicial information was improperly brought to the jury's attention," about what occurred during jury deliberations, particularly what they recall Juror 3 said during those deliberations to affect their minds and emotions, to influence them to assent or dissent from the verdict, as well as their mental processes in connection with reaching their verdict.

---

[5] On November 20, 2023, appellee filed a surreply to his motion for a new trial requesting oral argument on the question of an evidentiary hearing, to which appellant objected. The trial court then held oral argument on November 30. The oral argument transcript is not in the record, but on December 5, the trial court granted appellee's motion for an evidentiary hearing and scheduled it for December 18.

[6] "(1) Prohibited Testimony or Other Evidence. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying will not be received by the court for these purposes."

13.

{¶ 27} The jurors collectively testified that at all times the jury deliberations were polite and cordial. Each juror affirmed that no juror, including Juror 3, indicated: (1) they conducted their own outside research regarding the medical testimony that had been presented, (2) had consulted with doctors or other nurses regarding the testimony that had come out at trial, (3) had done internet research, (4) had consulted medical texts or journals, (5) insisted the other jurors view the evidence as Juror 3, or another juror with a medical-related background, viewed the evidence, or (6) ignore the judge's instructions.

{¶ 28} No juror, including Juror 10, recanted their vote for count No. two, felonious assault. No juror recanted their vote for count No. one, murder, except Juror 10.

{¶ 29} Juror 1, who was the jury foreperson, testified that each juror had the opportunity to speak during the deliberations. Every juror, including Juror 1, spoke at some point, with some speaking more than others with their opinion of the evidence presented during the five-day trial. Juror 1 did not think that Juror 3 monopolized the discussion. The jurors knew that fellow jurors included people with medical experience.

{¶ 30} Juror 1 did not recall what Juror 3 specifically said during deliberations but recalled Juror 3 answered questions directed to Juror 3 from other jurors that were "medical in nature." Juror 1 was not influenced in any way by what Juror 3 said, "Because of my knowledge of certain things and because of the facts that were presented in the case I felt that [appellee] was guilty. . . . I have a little bit of medical knowledge. I was an EMT for 12 years previously, so with my limited knowledge in the medical field, and with the facts presented to us as a jury, I felt that [appellee] was guilty."

14.

{¶ 31} When Juror 1 initially had the jurors vote by secret ballot on count No. 1, murder, 11 of the 12 jurors voted guilty, and one juror, Juror 5, voted not guilty and openly expressed their concern about the speed of the deliberations for a murder charge. As described by Juror 8, "The jury foreman decided after conversation was done of the facts to have a secret ballot to do that. And the ballot came back 11 guilty and 1 not guilty. And the person that voted not guilty volunteered who they were and said, well, I just hate to convict anybody of murder, but I think they verbally changed that vote, and we came to a unanimous vote that way." As described by Juror 4:

> [Juror 5] . . . did not really want to vote for murder. [Juror 5] wanted manslaughter. But in the situation, according to the rules [jury instructions] they gave us, once you do felonious assault you cannot do manslaughter. . . After the information we were given it said on there that if you decide on felonious assault you had no choice but to do murder . . . And [Juror 5] didn't want to be that strong. We told [Juror 5] we would deliberate longer if [they] so desired, but [Juror 5] . . . was okay, I guess.

{¶ 32} When Juror 5 was questioned, Juror 5 testified that the jury deliberations were like a conversation: "Um, in reaching the decision the conversation became so everybody was expressing their view points on different things . . .what happened in the case." As Juror 3 answered questions posed by other jurors, Juror 5 did not agree with Juror 3's responses. In response to the question, "And you, yourself, were not comfortable as a juror in relying upon those things which [Juror 3] said as it related to [Juror 3's] own personal professional experience," Juror 5 replied, "Correct." When asked again, "And so that we're clear, you indicated you disregarded what Juror Number 3 had to add to the jury deliberations?" Juror 5 replied, "Correct." Juror 5 affirmed that when Juror 3 spoke it was solely regarding the coroner's testimony they were collectively

deliberating. Then when Juror 5 was asked, "And your verdict was based off of, if I understand you, then, the evidence that was presented in trial," Juror 5 replied, "Correct." Juror 5 explained further:

> [Juror 3] was saying [their] opinion and personal experience that this is what had happened. . . . I can't remember a lot that [Juror 3] said. [Juror 3] was saying a lot, but [they] said that [the infant] had to have been shaken, and that [Juror 3] saw these kind of injuries before, and that's what happened. And the question came up that nobody said that he was shaken like that. The Coroner said one specific sentence about being shaken, but the way he was saying it it was -- he was using the motion back and forth, and this is what happened. And I kind of tried to get out of that conversation completely. I didn't agree with what [Juror 3] was saying.

**1. Juror 3's Alleged Influence on Juror 10 and Juror 3's Response**

{¶ 33} Beginning with Juror 10, a retired nurse, who submitted the affidavit alleging Juror 3's misconduct, we will review the testimony by the remaining jurors regarding Juror 3's alleged influence on them.

{¶ 34} Juror 10 testified that the trial court judge came into the jury room after discharging the jury while Juror 10 was crying "because I felt that -- that it was the wrong verdict. . . . And I felt terrible about -- about such a hard verdict for something I honestly didn't think happened." Juror 10 notified the judge that they "did not want to go with that verdict." The judge's response is not in the record. Later, Juror 10 went home and typed the letter to the judge "because I looked through the jury instructions again, and in the instructions it said, did the prosecution convince you of the guilt, and I knew that, as far as I was concerned, they did not . . . [with] the same certainty I had when I went into the jury room, you know, originally when I felt not guilty." Juror 10's purpose in writing the letter to the judge was: "To explain how we got to that verdict, because it was such a

16.

difficult verdict, and it went so quickly. Like it happened so quickly. Um, I don't know -- I think it was just to make myself not feel so sick about it."

{¶ 35} Nevertheless, Juror 10 testified how they reached their murder verdict: "the fact that . . . the Defendant had been through classes explaining how fragile the baby was, we felt that we could not say that he did not realize that it would do harm. That's why we had to go with the stronger verdict."

{¶ 36} Since the first secret ballot, Juror 10 voted guilty for count No. one, murder, and did not change that vote for the remainder of the jury deliberations or when polled in open court after the murder verdict was read aloud. Juror 10 did not explain why they had consistently voted guilty. Rather, given their post-verdict remorse, Juror 10 blamed Juror 3 for their vote while projecting that remorse onto other jurors. "[Juror 3] said, and I of course it's not a quote, but [Juror 3] said that in the case of brain trauma a baby would have these breathing -- you know, taking these breaths and having difficulty to breathe, and that that is very typical of brain trauma . . . That there was nothing we could say that would change that fact, which we thought was fact." Yet Juror 10 knew they did not have to follow Juror 3:

> Q: And if that was [Juror 3's] opinion on the matter, you back there as a juror, you had the ability to disregard [Juror 3's] opinion if you so chose, correct?
> A: Yes, but the way [Juror 3] said it was like [Juror 3] knows ·that this is it. Like there is no -- like there was no, um, no doubt.
> Q: So no doubt in [Juror 3's] mind.
> A: Yes.
> Q: Okay. And just like I previously asked, there was no doubt in [Juror 3's] mind regarding what the state of affairs were when that baby was handed over to [the mother from appellant], but you could have disregarded what [Juror 3] stated, correct?

A: Yes. I wish I did.

Q: And at any point did that juror tell you that you should disregard the Judge's instructions of law?

A: No.

{¶ 37} Despite the jury instructions to the contrary, Juror 10's testimony revealed improper speculation for appellee's punishment from a murder conviction:

Q: Anybody express to you that they were angry with the State of Ohio for pursuing murder charges this case?

A: I wouldn't say anyone was angry. We asked – and to be honest with you I don't remember if I was the one who asked, or someone else asked, if the prosecution gave him an option to – what's the term?

Q: I'm not sure because I'm not sure what –

A: Gave him an option to, um, come to a decision with the prosecution instead of going to trial or something.

Q: Like a plea agreement?

A: Yes. Exactly.

Q: Okay.

A: And apparently the plea agreement would have been so -- would have been almost as bad as being convicted, so I know we -- a couple of us had discussed that possibly he could get, you know, leniency or something, and then we were told after the verdict that no, you know, in this case there was no leniency. And that made it even worse because several of us thought that it wouldn't be that bad of a verdict.

{¶ 38} Juror 10 testified as to their own opinions interpreting, or speculating, on the evidence. For example, Juror 10 speculated on the victim's injuries from a drop: "I didn't think the drop – if the dropping occurred it was close to the floor. I didn't think that that would have caused the same type of injuries, but that was just a thought. No one said that." In another example, Juror 10 recalled the medical records indicated "not guilty": "Also in the medical records it said that there was no sign of trauma, and this was the emergency room medical records, and that the fact that there was vomit in the esophagus and -- the

18.

airway, rather, and that there were . . . no signs of trauma, that those were some of the strongest reasons what I felt that it should be not guilty." In another example, Juror 10 at first recalled that Juror 3 specifically "said that as [their] experience [they] felt that the symptoms that the baby was showing were symptoms of shaken baby syndrome, and then we believed [Juror 3], and I felt [Juror 3] knows what [they're] talking about, and I very sadly, then, went along with the guilt." But then Juror 10 recanted when asked by the judge whether Juror 3 ever said "shaken baby": "I don't recall if [Juror 3] said shaken baby syndrome." Later, the judge pressed again, "But based on your recollection are you confident in your testimony that Juror Number 3 used specific wording of shaken baby syndrome?" Juror 10 replied, "No. I'm not – I'm not sure."

{¶ 39} When Juror 3, a registered nurse and first-time juror, was intensely questioned about Juror 10's allegations, such as understanding witness descriptions of the victim's breathing during life-saving care, Juror 3 disputed the allegations for a number of reasons.

{¶ 40} First, Juror 3 affirmed their input was solely based on the trial evidence:

> Q: Did you base your opinion and ultimate verdict in this case off of the evidence that was presented in court?
> A: Yes.
> Q: Okay. And you indicated you made inferences regarding the evidence and how you personally interpreted that, correct?
> A: Correct.
> Q: Reasonable inferences based off of the evidence?
> A: Yes.
> . . .

19.

A: Like I said, I made my decision specifically based off of those injuries that the Coroner -- well, like I said, in conjunction with the other evidence presented but –

Court: So injuries – let's see. Injuries not disputed. How injuries occurred. Did you provide a medical basis for how the injuries occurred?

A: No. I went off of what the Coroner said.

Court: Was the dropping of the child discussed at the table?

A: I honestly don't recall.

{¶ 41} Second, Juror 3 affirmed their input during jury deliberations was based on their experiences gained prior to the trial and was not the result of outside research or information because of the trial. They understood this was allowed because of the trial judge's voir dire about "Can't make you un-know what you know" and the fact they were not dismissed as a juror at that time.

Q: You were never under the impression, therefore, I take, that evidence could be considered or brought into the deliberative process by the jury from someone such as yourself with background and experience in the medical field.

A: Yeah, I guess I didn't -- I wasn't aware I was bringing evidence. I was --

Q: Okay. It was not your intent, I take from this last answer, to do that, in fact?

A: No. I solely was trying to stick specifically to what was said in court.

Q: So if that occurred, or there is testimony perhaps from others in this case, or another in this case who served as a juror that that in fact occurred, you would disagree.

A: Yeah, I would disagree. . . . I mentioned when [Juror 10] said [I said] it was definitely due to brain trauma I would not say anything was definite, because you would have to be there, obviously. And then I mean I guess when it says [in Juror 10's affidavit] several other jurors stated they did not feel there was guilt either -- being in that room I didn't feel that was the case. Everybody had an opportunity, and there wasn't a whole lot of disagreement throughout it. . . . If what you're trying to ask me – I didn't add anything. I specifically tried to stick to what was -- what was I was able to write down throughout the court case.

{¶ 42} Third, Juror 3 felt they were unfairly targeted by Juror 10 for the other juror's own post-verdict remorse even though Juror 3 reminded the jurors to make their own decisions:

> When I spoke, and I gave my opinion, [a juror] had said in that time, and to quote [the juror] something along the lines of, you did a better job proving this than the Prosecutor. To which I responded, I said, you need to make your own decision, and don't put your guilt – like essentially I'm not going to carry the weight of your decision. And then -- so to read that after the fact, I felt like [Juror 10] essentially blamed me for [their] decision. I didn't feel like that was fair.

{¶ 43} Fourth, Juror 3 repeatedly disputed Juror 10's allegation, and the leading questions by the trial judge and defense counsel, that Juror 3 said the victim's death was "definitely due to brain trauma" because there could be multiple causes:

> I could not definitively say something when I wasn't there. I would never have said they were definitely due to brain trauma. I do believe in the initial -- it was my response the first witness [a licensed nurse who performed emergency infant CPR] had been discussing breathing. She kept saying the baby aspirated. When it was my turn to discuss, she had been saying aspirating, but what it sounded like with the breathing she described it sounded what we call like agonal-type breathing, which is usually caused by a couple things that can cause that type of breathing. . . . That's what I would have referenced, but, again, that's not specifically caused by a brain trauma either. . . . When it -- yes, when it was my turn to speak. Like I said, we kind of ran through where we are at from the beginning to the end, why in my opinion I didn't think it was aspiration is how she was describing it. And then also when you brought up a witness from Toledo Fire who also then said that they were able to air bag ventilate, and they had a patent airway, which you could not do that if you had something in your throat.

{¶ 44} Fifth, in response to the judge's intense questioning of the accuracy of Juror 3's recollection of certain witness' testimonies and of other jurors' input during deliberations, Juror 3 affirmed that ultimately, whatever input at deliberations Juror 3 gave about the victim's breathing, it was not about steering the jurors to a cause of death

21.

for "shaken baby" that was different from the coroner's testimony. Juror 3 testified that because there could be multiple causes for the victim's breathing, they did not and could not have said it was definitely due to one cause:

> Court: So would you say that your . . . personal professional medical assessments came because you were trying to explain why the injuries?
>
> A: No. I didn't at all try to explain the injuries. The injuries to me were -- what the Coroner had said is -- you know, when a Coroner gave his professional opinion that was –
>
> Court: What do you recall the professional opinion he gave? Because I asked a very specific question.
>
> A: That . . . it was consistent within a four-foot fall and shaken baby.
>
> Court: And you recall him saying a four-foot fall and shaken baby.
>
> A: I recall the shaken baby because then I recall them talking about the bruising -- lack of bruising on the chest. I recall that. And then I recall him talking -- when he did his autopsy, and I don't recall the specifics, but he mentioned with some redness on the eyes that he had seen that was consistent with shaken baby.
>
> Court: But you specifically referenced here for us that you recall the Coroner saying also a four-foot fall.
>
> A: I – yeah, I'm pretty sure that's what he said. Again, it was four months ago, so I don't recall. I mean obviously I was -- I could recollect if I had my notes, and I would have reviewed them, but I didn't keep them.
>
> Court: Okay. And with regard to the statements that you make -- that you made, and obviously you're right, it's been four months, to your best recollection did you, when talking about the agonal breathing, in anyway connect it to shaken baby?
>
> A: No. To me it was part of -- and I know obviously in this courtroom it has been the focus of this whole thing, but to me that was a part of a story.
>
> Court: I don't know what that means. I apologize.
>
> A: Like I said, it was the injuries and all these other things that went into it. To me the agonal breathing we mention I didn't -- it wasn't like something I was hyper focused on. It wasn't -- it just - - I just said that's what she [the nurse-neighbor certified in infant CPR who performed CPR on the victim until the EMTs arrived] was talking like sounded like to me.
>
> Court: Can you give me the definition that you rely on on what agonal breathing means.
>
> A: It's like snore respirations. It is a bizarre breathing pattern.
>
> Court: It is like snores?

22.

A: Well, she was saying the baby, if I recall, again, this is four months, but I believe she kept saying it was weird the baby was gasping -- gasping for air in her video, I think. . . It is kind of like that. It is like you're gasping for breath.

Court: I am going to ask you again, does it represent to you -- other than the breathing what is it an indicator of to you from your medical experience?

A: That usually it's like your brain isn't getting enough oxygen, but, again, there could be multiple causes to that. Could be, you know, a car accident with a traumatic injury. It could be a stroke. It could be a heart attack. It could be aspiration. It could be a trauma.

## 2. Juror 3's Alleged Influence on Juror 2

{¶ 45} Juror 10 also blamed Juror 3 for changing Juror 2's mind from not guilty to guilty for murder: "It might have been [Juror 2]. I'm pretty sure [Juror 2] was also going to -- but I can't say for sure, but the way [Juror 2] was talking in the beginning, and [Juror 2] seemed to – I thought [Juror 2] was going to also vote not guilty."

{¶ 46} When Juror 2 was questioned, they testified that Juror 3 did not "coerce" anyone, including Juror 2, during jury deliberations. Juror 2 made their decision, "after looking at all the evidence and then getting supportive answers from [Juror 3] as well." Juror 2 directly asked Juror 3 a question about when "the speech therapist had left the baby on the couch in the crib -- or in the car seat, and I wanted to know if a fall could have had the same -- same thing [from what we saw in the autopsy pictures]." Juror 3 answered "in a way where I could understand it." At that time the jurors were reviewing the coroner's autopsy report and pictures:

I did ask different questions, and [Juror 3] would come back with information that would substantiate what [Juror 3] saw with the pictures. . . . I asked more about like, well, could this be a possibility instead of the shaken baby syndrome. I would ask like a scenario question, and then [Juror 3] would answer back with [Juror 3's] knowledge. . . . Mostly [Juror

3 answered], if I had addressed it to [Juror 3]. Sometimes [Juror 6] might -- would have agreed with [Juror 3's] answer.

{¶ 47} Juror 3 responded to one of Juror 2's questions with, "Something about the force of it, and then the eyes, the way the blood was in the eye socket, something like that, and how it was in the [autopsy] picture would have been more like that from shaken baby syndrome, but then the drop from the couch would not have showed that." This corroborated Juror 2's recollection of the coroner's testimony, who "talked a lot about the eyes and the blood vessels as well." Juror 2 recalled the coroner testified "regarding seeing blood in reference to the infant's eyes and optic nerves . . .  that is one of the signs of shaken baby."

### 3. Juror 3's Alleged Influence on Juror 7

{¶ 48} Juror 5 thought that Juror 7 was possibly swayed by Juror 3. However, when Juror 7 was asked, "Now, from that I take that the verdict, which you yourself reached in this case, the verdict of guilty as to the charge of murder, was not influenced therefore by what, if anything, you recollect Juror Number 3 . . . having expressed by way of medical opinion during deliberations?" Juror 7's response was, "Correct. . . . I like to form my own opinion and took everything into consideration that had been presented to us throughout the case."

{¶ 49} Juror 7 testified the jury experience was, "Um, in my own opinion, hard. . . . Hard to sit through, hard to hear. First experience with it. . . . I definitely in my heart felt there was no winners in any of this." When asked how to describe the jury deliberations, Juror 7 answered, "Generally from what I remember like I think we went back and forth a

24.

little bit with certain things. To speak particularly, I can't do that cuz it's been a few months and a lot has went on with me through all that time. So I think collectively, I think all together, we came up with what we thought was the best outcome for this situation that was presented to us."

### 4. Juror 3's Alleged Influence on Juror 4

{¶ 50} Juror 4 testified that all jurors expressed their opinions and gave input during the jury deliberations. Juror 4 agreed it was "a fair-minded process during deliberation." Whether or not Juror 3 had more to add during deliberations than others, Juror 4 always ignored whatever Juror 3 expressed.

> Q: Was there any specific opinion that Juror 3 . . . expressed during the course of the deliberations that you disagreed with despite [Juror 3's] background and despite and in light of yours?
> A: No, I knew nothing about what [Juror 3] was talking about so --
> Q: Okay. Now, if you know nothing about what someone is talking about you can choose to ignore it?
> A: Right.
> Q: And did you choose to ignore whatever it was that Juror 3 was expressing during deliberations?
> A: Yes.
> Q: All right. Always?
> A: Yes. . . . At that point in time I didn't think it made a difference one way or other what [Juror 3] said.. . . I relied a lot on my notes and what I heard and what I took in during the trial. . . . [W]e already knew the baby had brain injuries, brain bleeds.

### 5. Juror 3's Alleged Influence on Juror 6

{¶ 51} Juror 6, a former emergency room nurse, confirmed making their guilty verdict solely on the evidence presented at trial: "I just went by what I heard in the courtroom."

25.

{¶ 52} Juror 6 described that the jury deliberations began "about the legalese, or what charges – each of the charges, everybody's understanding of it." Then "the majority of the discussion, as I recollect, was placed on the victim" because Juror 6 "thought that we really didn't focus on what happened at the time the crime occurred." Juror 6 expressed regret for not saying something during deliberations to center the discussion on what occurred at the crime scene, but did not blame Juror 3 for that regret. Juror 6 explained they believed discussing the victim's condition was not needed where the coroner testified "the cause of death was homicide." Juror 6 believed the job of the jury was not to spend too much time on the deteriorating state of the victim because "that wasn't really relevant to what -- I mean the child died, you know?"

{¶ 53} Juror 6 reiterated disregarding Juror 3's input because it was irrelevant: "I don't think they were as relevant as what, you know -- what actually occurred, the act itself, what actually happened." Juror 6 confirmed Juror 2's and Juror 8's recollections of agreeing with some of Juror 3's input: "So my experience was 20 years ago. . . .I mean [Juror 3] knew what [Juror 3] was talking about, and as [Juror 3] was speaking I'm kind of thinking oh, yeah, I remember. This makes sense. That makes sense."

{¶ 54} Juror 6 explained why they said Juror 3 "monopolized . . . Or dominated, or kind of like was the predominate speaker" during deliberations. According to Juror 6's recollection, "Well, I mean there is 12 people in the room, and . . . Juror Number 3, probably was the one that was the most verbal. I mean, you know, . . . [Juror 3] spoke the most I should say. [They] had the most input probably, and the most influence, and as I said, my -- you know, it was all about the deteriorating medical status of the victim,"

which Juror 6 thought was not relevant. When asked by the judge why Juror 6 thought that Juror 3 was trying to "impress" the other jurors, Juror 6 replied, "To educate and inform, but may have instead . . . overplayed it." Juror 6 believed Juror 3's focus on the victim's condition did not intend to give a cause of death to "distinguish for the rest of the jurors that it was because of his experience it was shaken baby versus it being a -- from a fall."

### 6. Juror 3's Alleged Influence on Juror 8

{¶ 55} Juror 8 testified that jury deliberations were about the evidence from trial: "The jury reviewed the physical evidence and things as a group. . . . And many people participated in the discussion, so I agree with what you said. . . . Everybody could speak who wanted to speak, yes. There was no frustration or anything like that."

{¶ 56} Juror 8 emphatically denied being in any way impacted by or influenced by what Juror 3 may have said during deliberations by repeatedly responding, "I am sure of that." Juror 8 stood by their murder verdict, regardless of anything Juror 3 said, because Juror 3's input did not deviate from the coroner's testimony and "[Juror 6] said, yeah, that sounds right." Juror 8 recalled the coroner "was quite clear and quite detailed, and the information was sitting right in front of us." Juror 8 testified, "[T]hat's my memory of what we -- we had lots of photos and other things sitting on the juror table. [Juror 3] reenforced what had happened to the baby and . . . [Juror 3] said, yeah, that sounds right. . . . I wasn't there to dispute [Juror 3], but it sounded accurate in accordance with what had been said by Dr. Blomquist." Juror 8 explained:

27.

Dr. Blomquist had made the case, in my opinion, very strong that it was a shaken baby thing. I -- I accepted – I believed that, but I think there were a few jurors who were unsure. . . . And [Juror 3] was saying, oh, no, I've seen this before. This is what it is. That's -- as I recall that's how the conversation went. . . . That's what I believe happened in the jury room. I had already accepted that it was, so I didn't hear the questions [to Juror 3], but I did hear that response.

### 7. Juror 3's Alleged Influence on Juror 9

{¶ 57} When Juror 9, a registered nurse, was asked, "Was your verdict in this case based off of the evidence that you heard presented throughout the trial?" their response was, "Yes."

{¶ 58} Juror 9 testified that "when I heard that [Juror 10 felt that Juror 3 coerced everybody to vote guilty], I did not feel that way. . . . So when [Juror 10] says that, again, that [Juror 3] influenced [the jury deliberations] . . . that was not my experience." Juror 9 disregarded Juror 3's input because " [the coroner's] testimony of the brain bleed was very clear to me" and because "[Juror 3] was not saying anything incorrect. I felt like it went along with a brain bleed."

{¶ 59} Like Juror 7, Juror 9 described the whole experience as "there were no winners in this trial." Like Juror 10, Juror 9 struggled with the "harsh verdict" for murder "at least how I felt, was we -- murder just didn't seem the right choice, but when we kept reading the letter of the law that seems where it seemed to fit into. And I know I struggle with that [to this day.]" Juror 9 further explained why the issue was not Juror 3's influence: "Where [Juror 10] says several other jurors stated they did not feel there was guilt either until Juror 3 gave us [their] opinion, most of us were devastated not thinking the Defendant deserves such a harsh verdict." Despite the improper concern for the

28.

punishment outcome, Juror 9 confirmed the unanimous guilty verdict, "Um, again, we just kept reading the definitions, and they kept coming back to murder, but -- and that just seemed too harsh, but every time – it's like we were trying not to be, but we kept reading the letter of the law that was in that packet, and it -- it just kept feeling like this is murder."

{¶ 60} Juror 9 applied their professional experience, not Juror 3's input, to understanding the evidence: " [A]s a nurse and things that I have seen, I -- the evidence of the brain bleed that is what settled – that's where I was -- um, I was not influenced by [Juror 3], because a brain bleed, you know, infant, is serious, you know, not supporting life." Juror 9 gave their opinion during jury deliberations, "I said [the infant] wasn't breathing because he had a brain bleed. That's why he wasn't breathing. . . I think what I was – what I was trying to say was there was a brain bleed, and whether it was from a drop or a shake, there is still a brain bleed, and the baby is not going to breathe." Even after Juror 9 was given a description of Juror 3's professional experience, Juror 9 replied, "Doesn't really ring a bell."

## 8. Juror 3's Alleged Influence on Juror 11

{¶ 61} Juror 11 affirmed their guilty verdict was not due to Juror 3's influence: "I feel like I based it on the conversation of all jurors and what I heard and listened to in the court" and, "I think for me personally I made a decision on a comprehensive . . . kind of just taking all of everybody's thoughts in, and my own, and what I heard [at trial]." Juror 11 explained, "I mean, I don't know that I held [what Juror 3 said] any heavier than some

29.

of the other previous -- I mean there were other medical people on the jury, um, and they had similar thought, I would say."

{¶ 62} Juror 11 testified, "Not even close, no" in response to the question of any juror expressing hostility, anger, upset, or brow beating towards the other jurors. Juror 3's professional experience was not forced on them: "I don't remember if [Juror 3] . . . had that specific [experience] . . . with an infant of that sickness and that age. . . . I never felt like [Juror 3] was saying, this is my perspective being a medical provider and you guys have to hold that as well. . . . [Juror 3] just said, here are my thoughts based on my experience and what I've heard." Juror 11 disputed characterizing Juror 3's input as "monopolizing" the jury deliberations: "I -- no, I would not say [Juror 3] monopolized. . . . I think I feel like I heard everyone speak." When the judge asked if "these questions for explanations [were because] the jurors did not feel they received from court," Juror 11 replied, "No, I feel like what we received from the Court kind of started the conversation."

{¶ 63} The coroner's report was openly discussed during deliberations. When asked if Juror 3 discussed injuries that were not also included in the coroner's testimony or report, Juror 11 responded, "I -- I don't remember . . . [Juror 3] having any other statements like outside of that [coroner's] report." When pressed by the judge to distinguish between jurors "asking [from Juror 3] for clarification for information that they did not receive in court, whether or not it was additional explanation . . . additional weight," Juror 11 replied, "Yeah, I think it was more clarification. I don't think we were

30.

ever saying, like -- I don't remember people saying, what do you think, as it related outside of it. I would say it was more clarification."

### 9. Juror 3's Alleged Influence on Juror 12

{¶ 64} Juror 12 testified that nothing Juror 3 said during jury deliberations impacted Juror 12's verdict because, "I think based on everything from the week [of trial] I had already kind of thought through my thoughts and had my views made." When pressed by defense counsel if Juror 12 "was in any way impacted by information conveyed during deliberations by Juror Number 3 by way of opinions based and derived from [their] medical experience," Juror 12 replied they did not allow what Juror 3 said "to impact me." When asked if Juror 12 recalled Juror 3 "indicating anything that was completely different from what [the coroner] had testified to or had placed in his autopsy report?" Juror 12's response was, "No." Juror 12 explained that "[Juror 3] was just talking through some of the injuries. . . . And I guess comparing them to some that [Juror 3] has seen perhaps."

{¶ 65} When asked if any juror was "preventing them in any way, shape, or form from expressing their own given view of the evidence," Juror 12 replied, "No. No. I mean there might have been a couple times where there were multiple people talking at once, and we did say one at a time. That was the extent of that."

### E. Trial Court Orders New Trial

{¶ 66} At appellant's request, the trial court ordered to seal the transcript of the evidentiary hearing. The parties submitted post-hearing briefs for the trial court's consideration.

31.

{¶ 67} On May 9, 2024, the trial court granted appellee's motion for a new trial. The trial court reasoned that Juror 3 possessed expert knowledge and experience as a former emergency room nurse, which had a probable effect on a hypothetical, average juror, citing *State v. McGail*, 2015-Ohio-5384, ¶ 38 (2d Dist.), even though the *McGail* court was addressing the aliunde rule's inadmissibility of evidence of extraneous information on the mind of a juror, which is not applicable here. Upon labeling Juror 3's jury deliberations as "expert" testimony, the trial court determined that a "registered Nurse is prohibited from making a 'medical diagnosis,'" citing *Duchene v. Finley,* 2015-Ohio-387, ¶ 13 and R.C. 4723 .151(A). Further, the trial court found that a registered nurse is "not competent to offer expert opinions as to medical causation." The trial court determined that Juror 3's opinions went to "two things that a Registered Nurse is not qualified to do -- diagnose a condition and opine as to medical causation" and was "improper extrinsic information and therefore constitutes juror misconduct."

{¶ 68} In its decision, the trial court determined that "misconduct of the jury" meant Juror 3's "statements as to medical causation during jury deliberations was improper extrinsic information." The trial court then determined that "extraneous prejudicial information" meant Juror 3's knowledge and experience "beyond that which is considered ordinary." The trial court distinguished the Ohio Supreme Court's holding in *State v. Ford*, 2019-Ohio-4539 to this case by finding that Juror 3 "paraded" their knowledge as a registered nurse by responding to juror questions to impress the other jurors and attract attention. The trial court found that Juror 3's parading "did not allow any such possibility of an accidental cause [implied by the coroner's testimony]." The

32.

trial court described Juror 3's input as "a strong opinion . . . given in the form of an expert medical opinion as to causation during jury deliberations that allowed no possibility of an accidental cause of the injuries was therefore contrary to the coroner's testimony that would allow some possibility that the injuries had an accidental cause." The trial court concluded that Juror 3's opinions expressed during jury deliberations – "to the effect that the victim's injury must have been from abuse or 'shaken baby'" -- were not "truly" based on Juror 3's "personal knowledge and experience" as a registered nurse because they were not confined to the evidence adduced at trial and went "to the ultimate issue of medical causation."

{¶ 69} To find prejudice, the trial court proceeded to identify various excerpts of juror testimony "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith." The trial court further found that Juror 3's "misconduct was prejudicial to Defendant's substantial rights" because Juror 3 "paraded" their "knowledge and experience of injuries similar to those of the victim." Despite the actual testimony by all jurors, except Juror 10, denying any influence by Juror 3, the trial court concluded, "The average juror in such a case, would most likely be impressed by [Juror 3's] knowledge and would therefore give great weight to [Juror 3's] medical causation opinion when deciding whether the victim's injury was caused by accident or abuse." Yet the trial court acknowledged, "Jurors, however, are

33.

permitted to evaluate trial evidence based upon their own particular education, professional qualifications, and life experiences."

{¶ 70} Appellant timely appealed the trial court's decision under R.C. 2945.67 and App.R. 5(C).

{¶ 71} We will address appellant's first and third assignments of error together as they are dispositive of this appeal.

## II. New Trial Due to Misconduct of the Jury

### A. Standard of Review

{¶ 72} We review the trial court's decision granting a motion a new trial under Crim.R. 33 for an abuse of discretion. *State v. McNeal*, 2022-Ohio-2703, ¶ 13; *State v. Schiebel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus. An abuse of discretion occurs when "a court [is] exercising its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. "[A]s we recently explained in *Johnson v. Abdullah*, 'courts lack the discretion to make errors of law, particularly when the trial court's decision goes against the plain language of a statute or rule.'" *McNeal* at ¶ 13, quoting *Johnson* at ¶ 39. However, where the motion for a new trial involves a question of law, we review questions of law de novo. *Id.*

{¶ 73} We review the two prongs of the trial court's decision to grant a new trial: first, whether juror misconduct actually occurred, and second, whether appellee met his burden to establish "the misconduct resulted in prejudice sufficient to warrant a new trial." *State v. Scott*, 2020-Ohio-4854, ¶ 38 (6th Dist.), citing Crim.R. 33(A) and *State v.* 34.

*Gunnell*, 2012-Ohio-3236, ¶ 40. In other words, the second prong requires us to review whether the juror misconduct "materially affected an accused's substantial rights" under Crim.R. 33(A)(2) and R.C. 2945.79(B), which mirror each other. *State v. Adams*, 2004-Ohio-5845, ¶ 45. To prejudice appellee's substantial rights, the juror misconduct must have affected the outcome of the trial court proceedings. *See State v. Boaston*, 2020-Ohio-1061, ¶ 62.

{¶ 74} This means that if no juror misconduct occurred under the first prong, we do not review the second prong. On the other hand, even if juror misconduct occurred under the first prong, appellee has the burden under the second prong to establish actual prejudice/actual bias due to the alleged juror misconduct. *Smith v. Phillips*, 455 U.S. 209, 215-216 (1982); *State v. Conway,* 2006-Ohio-791, ¶ 160; *State v. Herring*, 94 Ohio St.3d 246, 259 (2002). It is not enough for appellee to show that the alleged misconduct of Juror 3 had a conceivable effect on the outcome of the verdict because not every error that conceivably could have influenced the outcome undermines the reliability of the proceedings. *See State v. Dukes*, 2017-Ohio-7204, ¶ 96 (4th Dist.). This court has held that in determining prejudice to a defendant and whether he received a fair trial, we review de novo the materiality of the evidence. *State v. Jury*, 2022-Ohio-4419, ¶ 12 (6th Dist.). Here, the record provides us with the actual testimony of each juror, so speculation of any conceivable effects is improper.

## B. Misconduct of the Jury and Actual Prejudice

{¶ 75} Interpreting the meaning of "misconduct of the jury," an undefined term under Crim.R. 33(A)(2) and R.C. 2945.79(B), is a question of law which we review de

35.

novo, but the trial court's findings to support its decision to grant a new trial will not be disturbed absent an abuse of discretion. *Schiebel* at 76. The meaning of "misconduct of the jury" is determined upon review of "the specifics of what transpired in its proper context." *State v. Fisher*, 2021-Ohio-3788, ¶ 20 (3d Dist.).

{¶ 76} "The Sixth Amendment and Due Process Clause of the Fourteenth Amendment to the United States Constitution protect the right to a trial by a fair and impartial jury." *Scott* at ¶ 38 (6th Dist.). "An accused is guaranteed a fair trial, not a perfect one." *State v. Henson*, 2007-Ohio-3567, ¶ 10 (6th Dist.), citing *State v. Lott*, 51 Ohio St.3d 160, 166 (1990). "The trial court has a duty to ensure the defendant receives a fair trial and the ends of justice are served." *Scott* at ¶ 19 (6th Dist.).

{¶ 77} Generally, the jury's verdict is sacred, and the law ensures the finality of it and protects the sanctity of the jury room deliberations. *Ford*, 2019-Ohio-4539, at ¶ 296, citing *State v. Hessler*, 90 Ohio St.3d 108, 123 (2000) and *State v. Reiner*, 89 Ohio St.3d 342, 350 (2000), *reversed on other grounds Ohio v. Reiner*, 532 U.S. 17 (2001). Substantial policy considerations support the necessity of shielding jury deliberations from post-verdict scrutiny, such as harassment by the defeated party until securing something which might ultimately establish misconduct to set aside a verdict and the public's trust in a system that relies on the decisions of laypeople to fully and frankly discuss the case in the jury room and, when necessary, to return an unpopular verdict. *Tanner v. United States*, 483 U.S. 107, 120-121 (1987). "'If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation -- to the destruction of all frankness and

36.

freedom of discussion and conference.'" *Id.* at 120*, quoting *McDonald v. Pless,* 238 U.S. 264, 267-268 (1915).

{¶ 78} The trial court's new-trial hearing was limited to inquiring into the validity of the jury verdict, but not the verdict itself. *State v. Wilson*, 2018-Ohio-5167, ¶ 33 (5th Dist.), *appeal not accepted* 2019-Ohio-1421, citing *Warger v. Shauers*, 574 U.S. 40, 47 (2014). The jurors' testimonies collectively reflected the internal evidence of the jury's deliberations, which explicitly revealed what affected each juror's mind or emotions in the deliberations process. "This is precisely what Evid.R. 606(B) prohibits." *Hessler* at 124; *Grundy v. Dhillon*, 2008-Ohio-6324, ¶ 57.

{¶ 79} However, under Evid.R. 606(B)(2), effective July 1, 2022, there are three exceptions to the foregoing prohibition. First, whether "extraneous prejudicial information was improperly brought to the jury's attention." Evid.R. 606(B)(2)(a).[7] Second, whether "any outside influence was improperly brought to bear on any juror." Evid.R. 606(B)(2)(b). Or, third, whether "any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court occurred." Evid.R. 606(B)(2)(c). Here, there are no allegations under Evid.R. 606(B(2)(b) and (c).

---

[7] The staff notes to the 2022 amendment state that "Ohio Evid.R. 606(B) is being amended to more closely mirror Fed.Evid.R. 606(B), and is intended to address constitutional challenges to the former rule as being violative of a criminal defendant's constitutional rights because it infringed upon the defendant's fair trial rights." Relevant to this matter, the 2002 amendment eliminated the requirement that a juror's testimony on whether extraneous prejudicial information was improperly brought to the jury's attention "only after some outside evidence of that act or event has been presented."

37.

{¶ 80} Therefore, this appeal focuses on Evid.R. 606(B)(2)(a). Interpreting the meaning of "extraneous prejudicial information," an undefined term, is a question of law which we review de novo. The U.S. Supreme Court guides us to interpret "extraneous prejudicial information" by distinguishing whether the information was external or internal to the jury deliberations. While jurors may testify as to any fact showing the existence of an "extraneous influence," *Tanner* at 117, citing *Mattox v. United States*, 146 U.S. 140, 149 (1892), when the juror's conduct is an "internal matter," it is not admissible under the Fed.Evid.R. 606(B). *Id.* at 117-118. An "internal matter" is within the collective body of experiences each juror brings with them into the jury room. *Warger*, 574 U.S. at 51-52. In contrast, "extraneous information" is derived from a source external to the jury, such as publicity specific to the case being decided, newspapers, dictionaries, or personal investigation of the facts. *Id.*; *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 209 (2017); *United States v. Lakhani*, 480 F.3d 171, 184-85 (3d Cir. 2007); *Ford*, 2019-Ohio-4539, at ¶ 270.

{¶ 81} Importantly, "genuine persuasion" during jury deliberations is not an extraneous influence. "If the jury system is to function properly, not only must we rely on every juror to be open to genuine persuasion, but just as importantly, jurors must also hold steadfast to their firmly held beliefs." *Lakhani* at 185. Here, Juror 10 claimed they were initially in the minority but were ultimately persuaded to vote for guilt and had second thoughts post-verdict. Juror 10 now blames Juror 3 for being persuaded and now regrets their vote. Jurors are subject to human frailty, and our review is whether that human frailty became reversible error under Evid.R. 606(B)(2)(a). *Id.* (applying

38.

Fed.Evid.R. 606(B)). We will find no reversible error where the totality of the description by the jurors, including Juror 10's description, of the speedy, cordial jury deliberations reflect the normal price paid for a unanimous decision. *Hessler* at 120.

{¶ 82} In the course of the trial court's intense questioning of Juror 3, the trial court should not automatically dismiss Juror 3's credibility, nor inherently suspect Juror 3, where their testimony spotlights their honest belief of living up to the sanctity of their oath, of reaching their decision based on the evidence presented at trial and repeatedly disputing any influencing bias on other jurors. *Gunnell*, 2012-Ohio-3236, at ¶ 30; *State v. Fowler*, 2016-Ohio-5867, ¶ 9 (2d Dist.); *State v. Hickman*, 2015-Ohio-4668, ¶ 33 (9th Dist.). Nor should the trial court treat as inherently suspect 11 of the 12 jurors affirmatively stating post-verdict that Juror 3 did not influence their verdict because "'a juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court.'" *Fisher*, 2021-Ohio-3788, at ¶ 37 (3d Dist.), quoting *State v. Phillips*, 74 Ohio St.3d 72, 89 (1995); *Hickman* at ¶ 33; *State v. Thomas*, 2014-Ohio-2920, ¶ 34 (9th Dist.); *Gunnell* at ¶ 30.

{¶ 83} Upon de novo review we find no "misconduct of the jury" under Crim.R. 33(A)(2) and R.C. 2945.79(B) in the context of what actually transpired in this matter for the purpose of determining the existence of "extraneous prejudicial information" under Evid.R. 606(B)(2)(a). As a matter of law, we do not find such "misconduct of the jury" where it is undisputed that Juror 3 relied exclusively on the trial evidence viewed through their experiences gained prior to serving on the jury and did not include any independent

39.

inquiry or any experiment about the evidence or the law and did not urge or require any juror to reject the trial court's instructions and view the evidence as Juror 3 did.

{¶ 84} Further, we find the trial court abused its discretion when it determined that Juror 3 brought "extraneous prejudicial information" into the jury deliberations because it is undisputed that Juror 3's input was part of Juror 3's background, gained and disclosed before Juror 3 was selected to serve as a juror without objection. The trial court exercised its judgment, in an unwarranted way, to characterize Juror 3's input as prejudicial because of "parading" when every juror, except Juror 10, testified they disregarded Juror 3's input. Even where Juror 10 blames Juror 3 for persuading Juror 10 to vote guilty, that is a normal part of jury deliberations and not reversible error under Evid.R. 606(B)(2)(a). Juror 10's regret about the punishment appellee will face due to the jury's murder verdict is not evidence of misconduct by Juror 3.

{¶ 85} Even if somehow Juror 3's input was considered to be "misconduct by the jury," we find that appellee failed to establish actual prejudice/actual bias due to Juror 3's alleged misconduct, and the trial court abused its discretion to determine a new trial was warranted.

{¶ 86} First, the record is devoid of any deception by Juror 3 of failing to answer honestly a material question during voir dire regarding their work experience as a registered nurse, including in an Ohio emergency room. *Grundy*, 2008-Ohio-6324, at ¶ 3. Appellee chose to retain Juror 3 rather than dismiss them for cause. *Id.* In addition, each juror gave assurances to be fair and impartial and to follow the trial court's instructions. *State v. Thacker*, 2021-Ohio-2726, ¶ 51 (4th Dist.), citing *Grundy* at ¶ 52. The

40.

overwhelming juror testimonies affirmed they fulfilled their duties and followed the trial court's instructions. *Scott*, 2020-Ohio-4854, at ¶ 20 (6th Dist.).

{¶ 87} Second, every juror, including Juror 10, affirmed that Juror 3 spoke exclusively from their personal experience brought into the jury deliberation room. *State v. Skrzynski*, 2010-Ohio-2579, ¶ 25 (6th Dist.). Juror 3's personal experience, like all jurors with medical backgrounds, was an internal matter because such innate experience is unavoidably brought into the jury room. *Warger*, 574 U.S. at 44; *Ford*, 2019-Ohio-4539, at ¶ 273 (a juror's statements made during deliberations based on personal knowledge and experience do not constitute "extraneous prejudicial information"). As the trial court judge said repeatedly, Juror 3 "cannot un-know what you know," meaning that Juror 3 received the trial evidence through their considerable personal experience as a registered nurse that cannot be expected to be forgotten. *State v. Cain*, 2016-Ohio-7460, ¶ 9 (9th Dist.) ("a juror cannot simply 'forget' his or her own personal experiences"); *United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991) (courts do not expect jurors to cast aside their personal experiences during jury deliberations because inevitably jurors must rely on their past personal experiences when hearing the trial, of interpreting evidence in the record, and deliberating on a verdict).

{¶ 88} Third, every juror, except for Juror 10, testified that they followed the trial judge's instructions to apply the law to the facts from the evidence presented at trial. *Id.*, citing *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). Despite calling into question Juror 10's potential misconduct by relying on Juror 3 to persuade them, it is important to state that every juror, including Juror 10, affirmed that Juror 3 never told them to disregard

41.

their solemn duty or the jury instructions given by the trial court. *Ford* at ¶ 271; *State v. Bradley*, 3 Ohio St.2d 38, 41 (1965).

{¶ 89} Fourth, even a distraught juror, such as Juror 10, complaining about unfair pressure and coercion from Juror 3, is part and parcel of the process of our justice system requiring a unanimous decision and is not reversible error. *Ford* at ¶ 297. "'Heightened emotions and intense feelings are part and parcel of this process. Experience tells us that during deliberations, it is not unusual to find heavy-handed influencing, browbeating, and even bullying to a certain extent.'" *Id.*, quoting *Hessler*, 90 Ohio St.3d at 120.

{¶ 90} Fifth, every juror, except Juror 10, testified they disregarded what Juror 3 said when reaching their own guilty verdict for murder. *Fowler*, 2016-Ohio-5867, at ¶ 10 (2d Dist.), citing *Gunnell,* 2012-Ohio-3236, at ¶ 14. Upon de novo review we find the materiality of the evidence in the record does not support finding actual prejudice to appellee and does not justify granting a new trial. *Id.* In that situation, a trial court fails to soundly exercise its discretion, and the decision to award a new trial should be reversed. *Id.*, citing *Gunnell* at ¶ 33-40. No matter how the trial court characterized Juror 3's alleged misconduct as "coercive," "manipulative," "dominating," "parading," and the like, seizing on the minor discrepancies of the memory recall of a few jurors in response to intense, often leading questions, it remains significant that the jurors overwhelmingly testified Juror 3 had no impact on their verdicts. *Dukes*, 2017-Ohio-7204, at ¶ 93 (4th Dist.). Despite the trial court seizing on the discrepancies by jurors of their memory recall of specific trial evidence in response to intense, often leading questions, there was no "universal memory" among the jurors alleging any misconduct by Juror 3. *State v.*

*Marshall*, 2024-Ohio-4445, ¶ 27 (12th Dist.). We agree with the Twelfth District Court of Appeals that "The testimony of the varied jurors more confirms that human memory is fallible," just as the trial court said in its jury instructions. *Id.* at ¶ 28.

{¶ 91} Sixth, the trial court erred by using a hypothetical, average juror rather than what the jurors actually answered during intense questioning because a finding of prejudice requires more than "'mere supposition, surmise, and possibility of prejudice.'" *State v. Roper*, 2021-Ohio-188, ¶ 40 (9th Dist.), quoting *Gunnell* at ¶ 31. Speculation about prejudice from Juror 3's input does not present a colorable claim of outside influence by a juror. *Ford*, 2019-Ohio-4539, at ¶ 277. Here, the trial court speculated on the probable effect of Juror 3's "parading" on the jurors, despite 11 of the 12 testifying they ignored/disregarded/disagreed with whatever Juror 3 said when it came to reaching their guilty verdict. A trial court fails to exercise sound discretion to declare a mistrial based on juror misconduct where the prejudice is based on speculation of the hypothetical, average juror. *See Gunnell* at ¶ 40.

{¶ 92} Seventh, every juror, including Juror 10, affirmed by a poll in open court their guilty verdicts, without hesitation, for each offense. Such affirmation occurred after the jury deliberations and after the verdict was announced and enabled everyone to ascertain with certainty that a unanimous verdict had in fact been reached and that no juror had been coerced or induced to agree to a verdict to which they had not fully assented. *Ford* at ¶ 299, citing *State v. Williams*, 2003-Ohio-4396, ¶ 37; *Hessler*, 90 Ohio St.3d at 120. The importance of Juror 10's polling cannot be understated because "Once

43.

polling has been completed and all have assented to the verdict, 'a juror may not thereafter rescind or modify his or her vote.'" *Ford* at ¶ 299, quoting *Williams* at ¶ 38.

{¶ 93} Appellant's first and third assignments of error are well-taken. Given our foregoing determinations on the first and third assignments of error, the remaining assignments of error are moot. App.R. 12(A)(1)(c).

### IV. Conclusion

{¶ 94} On consideration whereof, the judgment of the Lucas County Court of Common Pleas, General Division, granting appellee's motion for a new trial is reversed, and the jury's unanimous guilty verdicts for count No. one, murder, and count No. two, felonious assault, are affirmed. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Charles E. Sulek, P.J.
CONCUR.

_____
JUDGE

Myron C. Duhart, J.
DISSENTS AND WRITES
SEPARATELY.

**DUHART, J., dissenting:**

{¶ 95} I respectfully dissent. I recognize that the majority's holding that the evidence injected by Juror 3 was not "extraneous prejudicial information" is supported by *State v. Ford*, 2019-Ohio-4539, ¶ 273. Nevertheless, I write separately to point out the defects in adopting such a narrow construction of "extraneous prejudicial information."

{¶ 96} I believe that the broad use of this standard -- without allowance for additional analysis and qualification based on the facts of each case -- opens the door to allowing the injection of nonrecord evidence into the jury's deliberative process, which would of course impinge upon the jury's fundamental duty to consider only the evidence presented at trial. Because intradeliberational statements that are based on personal knowledge and experience -- especially where, as here, those statements are used to draw a quasi-expert conclusion about a material issue in a case that is distinct from and additional to medical proofs adduced at trial -- can be every bit as harmful as extraneous misconduct, I would not limit a court's ability to review juror misconduct simply because it involves an "internal matter," as opposed to an "extraneous influence." In focusing on the source of a potentially impermissible discussion rather than on the impact of such discussion, courts run the very real risk of denying a defendant a fair trial.

{¶ 97} In this case, Juror 3 testified that during deliberations he introduced the subject of "agonal-type breathing" in connection with testimony by "the first witness," a neighbor, who had been discussing the baby's breathing and "kept saying the baby aspirated." According to Juror 3, the witness's testimony about how the baby was

45.

breathing was not consistent with aspiration. Juror 3 testified that this opinion was based upon his knowledge gained as the result of his professional status as a nurse.

{¶ 98} Juror 10 recalled Juror 3 stating during deliberations that in the case of brain trauma, a baby would have difficulty breathing, and that such difficulty is very typical of brain trauma. She further recalled Juror 3 stating that based upon his professional experience in the emergency room, "he felt that the symptoms that the baby was showing were symptoms of shaken baby syndrome." She testified that while she initially believed that Juror 3 knew what he was talking about, she later questioned that belief. Juror 10 testified that "[t]here was nothing said to convince me the Defendant caused the death of his son."

{¶ 99} While I acknowledge that it would be unrealistic to expect jurors to shed their knowledge and experience -- even their professional experience -- during deliberations, I would follow the reasoning set forth by the Court of Appeals of New York in *People v. Maragh*, 729 N.E. 2d 701 (2000). In that case, like the one at hand, medical issues involving the cause of the victim's death were vigorously contested. The prosecution submitted that the cause of the victim's death was blunt force trauma resulting from the defendant's having repeatedly punched the decedent in the abdomen. The defense, on the other hand, maintained that the victim suffered from seizure-type symptoms and died from a venous air embolism. One defense expert concluded that the victim's reported blood volume loss was inadequate to cause death and that the victim's ventricular fibrillation and congested blood vessels, as noted in the autopsy report, were consistent with an air embolism but inconsistent with death from a loss of blood.

46.

{¶ 100} Following the trial, it became clear that two jurors who were nurses injected professional opinions consisting of nonevidentiary assessments regarding the volume of blood loss necessary to cause ventricular defibrillation and that these professional opinions were shared with the full jury. Specifically, Nurse Juror #1 told the jury that, in her medical experience and estimation, the reported volume of the victim's blood loss could have caused ventricular fibrillation which would result in death. She also indicated to the jury that she had seen patients suffer ventricular fibrillation as a result of blood loss. Nurse Juror #2, for her part, performed personal estimations of the blood volume loss and shared them with the rest of the jury.

{¶ 101} In assessing the propriety of the nurses' conduct, the *Maragh* court stated that a reviewing court should evaluate whether a juror's conduct "created a substantial risk of prejudice to the rights of the defendant by *coloring the views of the other jurors* as well as her own." *Id.* at 704 (emphasis added). The court found a grave potential for prejudice where a juror who is a professional in everyday life shares his expertise to evaluate and draw an expert conclusion about a material issue in the case that is *distinct from and additional to* the medical proofs adduced at trial. *Id.* "Other jurors are likely to defer to the gratuitous injection of expertise and evaluations by fellow professional jurors, over and above their own everyday experiences, judgment and adduced proofs at trial." *Id.*

{¶ 102} As did the court in *Maragh*, I would disallow a juror from taking the "additional, forbidden step *beyond the evidence* of the cases before [him]," because "[t]hat would violate the rights of litigants to have their cases decided only on the

47.

evidence adduced, and would substitute [the juror's] own professional opinions in place of expert proofs at trial." *Id.* at 705 (emphasis added). A juror's professional opinion should be found to produce reversible error when shared with the rest of the jury, because "it injects nonrecord evidence into the jury's deliberative process -- a fundamental breach of standard operating evidence appraisal and trial adjudication." *Id.* "Indeed, such conduct compromises the integrity of the jury process, as would the introduction of ex parte communications or materials that are not part of tested evidence at trial." *Id.* Thus, I would affirm the judgment of the trial court.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.